DUBAI PETROLEUM COMPANY, Conoco, Inc., Dresser Industries, Inc. d/b/a Dresser–Rand Company, Aeroquip Corporation, Solar Turbines Incorporated and Energy Service International, Ltd. a/k/a ESI, Inc., Petitioners,

v.

Sabiha Alimuddin KAZI, individually and as representative of the estate of Alimuddin Sirajuddin Kazi, deceased, and as guardian for Mumtaz Alimuddin Kazi and Shehnaz Alimuddin Kazi, children, Sirajuddin Najmuddin Kazi, father, Farida Sirajuddin Kazi, mother, Respondents.

No. 97–1068.

Supreme Court of Texas.

Argued Sept. 10, 1998.

Decided Feb. 10, 2000.

---

36. 952 S.W.2d at 128.

Larry Funderburk, Michael A. Plotz, Michael K. Bell, Tracy J. Willi, Gregory G. Funderburk, JoAnn Storey, Houston, for Petitioners.

Jeffrey W. Mankoff, Dallas, for Respondents.

Chief Justice PHILLIPS delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice BAKER, Justice ABBOTT, Justice HANKINSON, Justice O'NEILL and Justice GONZALES joined.

We withdraw our January 6 opinion and substitute the following.

Section 71.031 of the Texas Civil Practice and Remedies Code permits suit for the personal injury or wrongful death of a citizen of a foreign country, if the decedent or injured party's country of citizenship has "equal treaty rights" with the United States. In this wrongful death case, we hold that the "equal treaty rights" requirement is not jurisdictional and that the plaintiffs have satisfied their initial burden to show that the decedent's country of citizenship offers "equal treaty rights" to United States citizens. Accordingly, we affirm the judgment of the court of appeals, which reversed the trial court's order dismissing the case for lack of subject-matter jurisdiction. 961 S.W.2d 313.

I

Alimuddin Sirajuddin Kazi, a citizen of India, was killed while working on an oil rig off the coast of the United Arab Emirates. Kazi's survivors, all citizens of India, brought this wrongful death suit in Harris County district court, basing their claim on Texas Civil Practice and Remedies Code section 71.031. When the Kazis filed this suit in 1993, section 71.031 provided:

(a) An action for damages for the death or personal injury of a citizen of this state, of the United States, or of a foreign country may be enforced in the courts of this state, although the wrong-

ful act, neglect, or default causing the death or injury takes place in a foreign state or country, if:

(1) a law of the foreign state or country or of this state gives a right to maintain an action for damages for the death or injury;

(2) the action is begun in this state within the time provided by the laws of this state for beginning the action; and

(3) in the case of a citizen of a foreign country, the country has equal treaty rights with the United States on behalf of its citizens.

TEX. CIV. PRAC. & REM.CODE § 71.031(a) (1997).[1]

Defendants, Dubai Petroleum Company, Inc., Conoco, Inc., Dresser Industries, Inc. d/b/a Dresser–Rand Co., Aeroquip Corporation, Solar Turbines Incorporated, and Energy Service International, LTD a/k/a ESI., Inc., responded that the trial court lacked subject-matter jurisdiction because India does not have "equal treaty rights" with the United States as section 71.031(a)(3)required. The court agreed and dismissed the case.[2]

The court of appeals reversed, holding that the International Covenant on Civil and Political Rights, *adopted by the U.N.*

General Assembly Dec. 16, 1966, 999 U.N.T.S. 171, *reprinted in* 6 I.L.M. 368 ("Covenant"), confers "equal treaty rights" between India and the United States. 961 S.W.2d at 318. The court of appeals sought guidance from a footnote in our opinion in *Dow Chemical Co. v. Alfaro*, 786 S.W.2d 674, 675 n. 2 (Tex.1990), which requires the existence of treaty provisions "similar" to those in the Friendship, Commerce, and Navigation ("FCN") Treaty between Costa Rica and the United States[3] to satisfy subsection (a)(3) of section 71.031. Determining that the Covenant's provisions were sufficiently "similar" to the rights extended in the FCN Treaty, which include (1) protection to persons and property, (2) free and open access to the courts, (3) the ability to employ counsel, and (4) the same rights and privileges as native citizens, the court of appeals held that Texas courts have subject-matter jurisdiction over the Kazis' wrongful death action. 961 S.W.2d at 318. For different reasons than the court of appeals gave, we affirm that judgment.

II

It is well-settled that "[a] judgment may properly be rendered against a

1. Section 71.031 was amended in 1997 so that the "equal treaty rights" provision now falls under subsection(a)(4), but the language of that provision was not altered. TEX. CIV. PRAC. & REM.CODE § 71.031 (Supp.2000).

2. The Kazis filed this action nineteen days before the effective date of Texas Civil Practice and Remedies Code section 71.051(a), which allows a Texas court to dismiss an action by a non-resident alien for an injury or death occurring outside Texas under the doctrine of forum non conveniens. *See* TEX. CIV. PRAC. & REM.CODE § 71.051(a) (Supp.2000). Therefore, defendants did not seek to dismiss the case under that statute.

Unlike section 71.051(a), which applies only to plaintiffs who are not legal residents of this country, section 71.031's "equal treaty rights" requirement applies to all citizens of foreign countries, including legal residents of this country. *Compare* TEX. CIV. PRAC. & REM. CODE § 71.031(a)(4) (Supp.2000), *with id.*

§ 71.051(a). The federal Constitution limits the states' ability to discriminate against foreign citizens who reside in this country. *See, e.g., Bernal v. Fainter*, 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). As the decedent in this case was not a United States resident, we need not determine whether the "equal treaty rights" requirement can constitutionally be applied to resident aliens.

Because section 71.031 frames the "equal treaty rights" requirement in terms of the injured party's citizenship, this opinion discusses the effect of that requirement on suits by or on behalf of foreign *citizens*. We caution, however, that one should not view our use of the word "citizen" as resolving the constitutionality of the "equal treaty rights" requirement as applied to resident aliens.

3. Treaty of Friendship, Commerce, and Navigation, July 10, 1851, U.S.-Costa Rica, art. VII, ¶ 2, 10 Stat. 916, 920, T.S. No. 62.

party only if the court has authority to adjudicate the type of controversy involved in the action." RESTATEMENT (SECOND) OF JUDGMENTS § 11 (1982). For federal district courts or state trial courts of limited jurisdiction, the authority to adjudicate must be established at the outset of each case, as jurisdiction is never presumed. *See* 13 Charles A. WRIGHT, ARYHUR R. MILLER & EDWARD H. COPPER, FEDERAL PRACTICE & PROCEDURE § 3522, at 62 (1984). A Texas district court, however, is a court of general jurisdiction. Our Constitution provides that the jurisdiction of a district court "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." TEX. CONST. art. V, § 8. By statute, district courts have "the jurisdiction provided by Article V, Section 8, of the Texas Constitution," TEX. GOV'T CODE § 24.007, and "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity." TEX. GOV'T CODE § 24.008.[4] For "courts of general jurisdiction, . . . the presumption is that they have subject matter jurisdiction unless a showing can be made to the contrary." 13 WRIGHT ET AL., *supra*, at § 3522, at 60; *see also* 16 CASAD ET AL., MOORE'S FEDERAL PRACTICE § 108.04[2], at 108–19 (3d ed.1999); *Dean v. State ex rel. Bailey*, 88 Tex. 290, 30 S.W. 1047, 1048 (1895) ("No other court having jurisdiction over the cause, the district court has the power to determine the right of the case, and to apply the remedy."); *Bowles v. Angelo*, 188 S.W.2d 691, 693 (Tex.Civ.App.—Galveston 1945, no writ) ("[I]f the jurisdiction necessary to relieve against a wrong is not to be found in the specific grants of jurisdiction to the justice or the county court, then it has either been specifically granted to the district court, or conferred upon that court in the grant to it of all residuary jurisdiction."); 2 BRADEN, ET AL., THE CONSTITUTION OF THE STATE OF TEXAS, AN ANNOTATED AND COMPARATIVE ANALYSIS 411 (1977). Thus, all claims are presumed to fall within the jurisdiction of the district court unless the Legislature or Congress has provided that they must be heard elsewhere.

■ However, this Court has held that this presumption does not apply to actions grounded in statute rather than the common law. For example, this Court held in *Mingus v. Wadley*, 115 Tex. 551, 285 S.W. 1084 (1926):

> The general rule is where the cause of action and remedy for its enforcement are derived not from the common law but from the statute, the statutory provisions are mandatory and exclusive, and must be complied with in all respects or the action is not maintainable.

*Id.* at 1087. Further, the Court stated:

> ". . . there is no presumption of jurisdiction where a court, although it is one of general jurisdiction, exercises special statutory powers in a special statutory manner or otherwise than according to the courts of the common law, since under such circumstances the court

---

4. A third general jurisdictional statute, section 24.009, provides that "[i]f two or more persons originally and properly join in one suit, the suit for jurisdictional purposes is treated as if one party is suing for the aggregate amount of all their claims added together, excluding interests and costs." TEX. GOV'T CODE § 24.009. This section may be irrelevant to district courts, where there may no longer be a jurisdictional minimum, but it does apply to statutory county courts, where suits clearly must allege a certain minimum value for the court to exercise jurisdiction unless by law the jurisdiction of the statutory county court has been made equivalent to the district court in civil cases. TEX. GOV'T CODE § 25.0003(c)(1); *see also Smith v. Clary Corp.*, 917 S.W.2d 796, 797 (Tex.1996) (holding that the statute applies to statutory county courts only "to allow multiple plaintiffs to aggregate their claims to achieve the minimum jurisdictional amount for a court, not to defeat jurisdiction"); *Peek v. Equipment Serv. Co.*, 779 S.W.2d 802, 803–04 n. 4 (Tex.1989) (discussing without deciding whether a jurisdictional minimum still exists for Texas district courts).

stands with reference to the special power exercised on the same footing with courts of limited and inferior jurisdiction."

*Id.* at 1089 (quoting 15 Corpus Juris Courts, § 148(c), at 831–32). We have repeatedly reaffirmed this dichotomy between common-law and statutory actions. *See, e.g., Grounds v. Tolar Indep. Sch. Dist.,* 707 S.W.2d 889, 891 (Tex.1986); *Texas Catastrophe Property Ins. Ass'n v. Council of Co–Owners of Saida II Towers Condominium Ass'n,* 706 S.W.2d 644, 646 (Tex.1986); *Alpha Petroleum Co. v. Terrell,* 122 Tex. 257, 59 S.W.2d 364, 367–68 (1933); *see also Cunningham v. Robison,* 104 Tex. 227, 136 S.W. 441, 442 (1911). Likewise, the court of appeals below concluded that a claim must satisfy all the requisites of section 71.031 in order for the district court to assert subject-matter jurisdiction. 961 S.W.2d at 314. This approach is consistent with the language of other appellate decisions. *See Owens–Corning Fiberglas Corp. v. Baker,* 838 S.W.2d 838, 841 n. 2 (Tex.App.—Texarkana 1992, no writ); *Alfaro v. Dow Chem.,* 751 S.W.2d 208, 208–09 (Tex.App.—Houston [1st Dist.] 1988), *aff'd,* 786 S.W.2d 674 (Tex.1990).

■ But while conceptualizing subject-matter jurisdiction in this way has an initial appeal, the resulting practical difficulties suggest underlying logical flaws. Because of the longstanding principle that subject-matter jurisdiction is a power that "exists by operation of law only, and cannot be conferred upon any court by consent or waiver," *Federal Underwriters Exch. v. Pugh,* 141 Tex. 539, 174 S.W.2d 598, 600 (1943), a judgment will never be considered final if the court lacked subject-matter jurisdiction. "The classification of a matter as one of [subject-matter] jurisdiction ... opens the way to making judgments vulnerable to delayed attack for a variety of irregularities that perhaps better ought to be sealed in a judgment." Restatement (Second) of Judgments § 12 cmt. b, at 118 (1982). When, as here, it is

difficult to tell whether or not the parties have satisfied the requisites of a particular statute, it seems perverse to treat a judgment as perpetually void merely because the court or the parties made a good-faith mistake in interpreting the law. Thus, the rationale of *Mingus* has been criticized as "more suited to a eulogy for the common law than to a businesslike administration of justice." Dobbs, *Trial Court Error as an Excess of Jurisdiction,* 43 Texas L. Rev. 854, 878 (1965). It wrongly assumes that a court exercising its common-law authority would never be "willing to introduce new procedures, new remedies, and new substantive rules," and that "something is functionally different about a non-common law proceeding, and that, therefore, courts are justified in regarding such proceedings in a harsher light." *Id.* at 878–79.

Although *Mingus* represented the dominant approach when it was decided, "the modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." Restatement (Second) of Judgments § 11 cmt. e, at 113 (1982). *See generally* Boskey & Braucher, *Jurisdiction and Collateral Attack,* 40 Colum. L.Rev. 1006 (1940); Note, *Filling the Void: Jurisdictional Power and Jurisdictional Attacks on Judgements,* 87 Yale L.J. 164 (1977). We therefore overrule *Mingus* to the extent that it characterized the plaintiff's failure to establish a statutory prerequisite as jurisdictional. The trial court in this case had jurisdiction because a claim for wrongful death was within its constitutional jurisdiction, not because the plaintiffs satisfied all the grounds listed in former section 71.031(a). Thus, while defendants in this Court and the Kazis in the court of appeals framed their argument in terms of whether the district court did or did not have subject-matter jurisdiction, we consider those arguments in the context of whether the Kazis established their right under the statute to go forward with this suit. "The right of a plaintiff to maintain a suit, while frequently treated as

going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." 21 C.J.S. *Courts* § 16, at 23 (1990).

## III

■ Having made the preliminary determination that section 71.031 is not jurisdictional, we now discuss the meaning of "equal treaty rights" in order to determine whether plaintiffs met its requirements. We hold that "equal treaty rights" means that a country grants—based on a treaty— to United States citizens the same rights to sue in its courts for personal injury or death that it grants to its own citizens. This does not mean that the substantive law, remedies, or procedures in Texas and the foreign country have to coincide, or even be remotely similar. But it does require that the decedent's or injured party's country of citizenship allow United States citizens to pursue available remedies for personal injury or death in its courts to the same extent that it allows its own citizens to pursue those remedies.

The "equal treaty rights" requirement first appeared in a 1913 statute allowing Texas courts to hear wrongful death or personal injury actions for injuries occurring outside the state.[5] This statute allowed suits for out-of-state injuries to Texans or citizens of countries having equal treaty rights with the United States if the law of the place of injury provided for such an action and the action was filed within the limitations period provided for by Texas law. In 1917, the Legislature passed a similar statute allowing suits for out-of-state injuries to citizens of other states. *See* Act of March 30, 1917, 35th Leg., R.S., ch. 156, § 1, 1917 Tex. Gen. Laws 365.[6] The two statutes were combined in the Revised Statutes of 1925 as article 4678.[7] In 1975, the Legislature amended article 4678 to relax the requirement that the law of the place of injury provide for a cause of action by allowing an action if either Texas law or the law of the place of injury supported it.[8] In 1985, article 4678 was reco-

5. "[W]henever the death or personal injury of a citizen of this State or of a country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by a wrongful act, neglect or default in any State, for which a right to maintain an action and recover damages in respect thereof is given by a statute or by law of such State, territory, or foreign country such right of action may be enforced in the courts of the United States, or in the courts of this State, within the time prescribed for the commencement of such action by the statute of this State, and the law of the former shall control in the maintenance of such action in all matters pertaining to procedure." Act of April 8, 1913, 33rd Leg., R.S., ch. 161, § 1, 1913 Tex. Gen. Laws 338.

6. "[W]henever the death or personal injury of a citizen of this State or of the United States, or of any foreign country having equal treaty rights on behalf of its citizens, has been or may be caused by the wrongful act, neglect or default of another in any such foreign state or country for which a right to maintain an action and recover damages thereof is given by the statute or law of such foreign country, such right of action may be enforced in the courts of this State within the time prescribed for the commencement of such actions by the

statute of this State, and the law of the forum shall control in the prosecution and maintenance of such action in the courts of this State in all matters pertaining to procedure." Act of March 30, 1917, 35th Leg., R.S., ch. 156, § 1, 1917 Tex. Gen. Laws 365.

7. "Whenever the death or personal injury of a citizen of this State or of the United States, or of any country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by the wrongful act, neglect or default of another in any foreign State or country for which a right to maintain an action thereof is given by the statute or law of such foreign state or country, such right of action may be enforced in the courts of this State within the time prescribed for the commencement of such actions by the statutes of this State. The law of the forum shall control in the prosecution and maintenance of such action in the Courts of this State in all matters pertaining to the procedure." TEX.REV.STAT. art. 4678 (1925).

8. "Whenever the death or personal injury of a citizen of this State or of the United States, or of any foreign country having equal treaty rights with the United States on behalf of its citizens, has been or may be caused by the

dified as section 71.031. *See* Act of June 16, 1985, 69th Leg., ch. 959, 1985 Tex. Gen. Laws 3242, 3297. Finally, in 1997, the Legislature added the additional requirement to section 71.031 that actions for out-of-state injuries to nonresidents be brought within the limitations period provided by the law of the place of injury. *See* Act of May 29, 1997, 75th Leg., R.S., ch. 424, § 3, Tex. Gen. Laws 1680, 1683 (codified at TEX. CIV. PRAC. & REM.CODE § 71.031(a)(3) (Supp.2000)); *see also Owens Corning v. Carter*, 997 S.W.2d 560, 566 (Tex.1999).

There is little outside the text of the statute to guide our interpretation of the phrase "equal treaty rights." We have not determined from what source, if any, the term was borrowed in the original statutes, and we have found no legislative history or contemporaneous records that explain the legislative purpose. Even the diplomatic and legal events of the period provide no significant clues for the meaning of "equal treaty rights."

It appears that the main purpose of the 1913 Act was to allow Texas citizens to sue in Texas for injuries occurring outside Texas. *See Alfaro*, 786 S.W.2d at 692 (Gonzalez, J., dissenting)("The original version of section 71.031 was enacted in 1913 to give *Texas citizens* the right to maintain a cause of action in the courts of this State ...." (emphasis in original)); *Marmon v. Mustang Aviation, Inc.*, 430

S.W.2d 182, 185 (Tex.1968)("[The 1913 Act's] purpose was simply to provide that a right of action arising under the laws of a foreign state or country for the wrongful death of a Texas citizen could be enforced in Texas courts."). At the turn of the century, the dissimilarity doctrine barred Texas citizens from suing in a Texas court for injuries occurring outside Texas. This doctrine provided that a Texas court could not enforce a cause of action based on the law of the place of injury if that law was dissimilar to Texas law. *See Mexican Nat'l R.R. v. Jackson*, 89 Tex. 107, 33 S.W. 857, 860 (1896); *Texas & P. Ry. v. Richards*, 68 Tex. 375, 4 S.W. 627, 629 (1887). That the main purpose of the 1913 Act was to ameliorate the effects of this doctrine on Texas residents is apparent from the Act's title, which noted that the Act was "for the protection of persons of this State who may be injured in a foreign country and providing for adequate compensation therefor," and its emergency clause, which indicated that the impetus for the Act was "[t]he fact that there is now no law permitting citizens of this State who receive injuries in a foreign country from bringing an action for said injuries under the laws of this State...." Act of April 8, 1913, 33rd Leg., R.S., ch. 161, § 1, 1913 Tex. Gen. Laws 338, 338–39.[9]

This explanation for the Act, however, fails to reveal why the Legislature estab-

---

wrongful act, neglect or default of another in any foreign State or country for which a right to maintain an action and recover damages thereof is given by the statute or law of such foreign State or country or of this State, such right of action may be enforced in the courts of this State within the time prescribed for the commencement of such actions by the statutes of this State. All matters pertaining to procedure in the prosecution or maintenance of such action in the courts of this State shall be governed by the law of this State, and the court shall apply such rules of substantive law as are appropriate under the facts of the case." Act of May 29, 1975, 64th Leg., R.S., ch. 530, § 2, 1975 Tex. Gen. Laws 1381, 1382.

9. In 1979, this Court, which had created the dissimilarity doctrine, abolished it. *See Gu-*

*tierrez v. Collins*, 583 S.W.2d 312, 322 (Tex. 1979) ("We therefore hold that for this trial, and henceforth in the trial of all actions, the dissimilarity doctrine will no longer be recognized as a defense."). This Court's abolition of the dissimilarity doctrine, however, did not render nugatory section 71.031's requirements for personal injury or wrongful death suits accruing outside Texas. Both this Court and Legislature have treated section 71.031 as not only permissive but mandatory—that is, allowing suits by plaintiffs who meet its requirements and prohibiting suits by plaintiffs who do not. *See Owens Corning v. Carter*, 997 S.W.2d 560, 571–72 (Tex.1999)(assuming that plaintiffs who do not meet section 71.031's requirements cannot sue in a Texas court).

lished the right to sue in Texas courts for out-of-state injuries to foreign citizens or what the Legislature meant when it limited that right to citizens of countries "having equal treaty rights with the United States on behalf of its citizens." Likewise, none of the Legislatures that subsequently recodified or amended the statute provided any explanation for the phrase's meaning. The first judicial discussion of section 71.031's "equal treaty rights" provision came only in 1990 with the footnote in *Alfaro* referred to at the beginning of this opinion. That footnote quotes this language from the FCN Treaty between the United States and Costa Rica:

> The citizens of the high contracting parties shall reciprocally receive and enjoy full and perfect protection for their persons and property, and shall have free and open access to the courts of justice in the said countries respectively, for the prosecution and defense of their just rights; and they shall be at liberty to employ, in all cases, the advocates, attorneys, or agents of whatever description, whom they may think proper, and they shall enjoy in this respect the same rights and privileges therein as native citizens.

*Alfaro*, 786 S.W.2d at 675 n. 2 (citing Treaty of Friendship, Commerce, and Navigation, July 10, 1851, U.S.-Costa Rica, art. VII, ¶ 2, 10 Stat. 916, 920, T.S. No. 62). The footnote states that "[s]ubsection (a)(3) requires the existence of *similar* treaty provisions before an action by a citizen of a foreign country may be maintained under Section 71.031." *Id.* (emphasis added). From this language, defendants argue that to satisfy the "equal treaty rights" requirement, a plaintiff must prove that the decedent's or injured party's country is a signatory to a treaty that provides for the essence of the four guarantees extracted from the FCN Treaty in *Alfaro:* (1) protection for persons and property; (2) free and open access to the foreign country's courts; (3) the liberty to employ attorneys, advocates, or other agents; and (4) the same rights

and privileges in court as native citizens. Defendants claim that the court of appeals erred in holding that the Kazis met this standard because neither the International Covenant on Civil and Political Rights nor any of the other treaties the Kazis cite contain all four of these guarantees.

If the "equal treaty rights" provision required the existence of all four guarantees set out in the FCN Treaty between Costa Rica and the United States, we might agree with defendants, as the International Covenant does not explicitly guarantee protection for property and does not provide for counsel in civil cases. We do not believe, however, that "equal treaty rights" requires the existence of a treaty with the exact same guarantees as the treaty at issue in *Alfaro*. Nothing in the statutory language suggests that a plaintiff must produce a treaty identical to one negotiated nearly a century and a half ago. The *Alfaro* footnote gave no reasons and cited no authority for its conclusion, which was not in any event necessary for the ·result in that case. Therefore, we decline to recognize it as authoritative. Likewise, the appellate cases that have subsequently discussed the "equal treaty rights" requirement offer no interpretation of the statutory language. In one, the court stated simply that "Greece and the United States have equal treaty rights," citing a treaty providing each country's citizens equal access to and treatment in the other country's courts. *Toubaniaris v. American Bureau of Shipping*, 981 S.W.2d 858, 859 n. 1 (Tex.App.—Houston [1st Dist.] 1998, pet. denied)(citing Treaty of Friendship, Commerce and Navigation, Aug. 3, 1951, U.S.-Greece, art. VI, ¶ 1, 5 U.S.T. 1829, 1841). In the other, the court concluded, without explanation, that "equal treaty rights" exist between the United States and Canada because the two countries are party to several treaties granting court access and substantive rights to each other's citizens. *See Owens–Corning Fiberglas Corp. v. Baker*, 838 S.W.2d 838, 841 (Tex.App.—Texarkana 1992, no writ).

Instead of relying on the *Alfaro* dictum or these two conclusory statements, we look to the language and probable purpose of section 71.031 to determine the meaning of "equal treaty rights."

The 1913 statute allowed suits for the injury or death of a foreign citizen occurring outside Texas, if they met the following three requirements: first, that the decedent's or injured party's country of citizenship have "equal treaty rights with the United States on behalf of its citizens"; second, that the law of the place of injury provide a right to maintain an action and recover damages for the wrong complained of; and third, that the action be brought within the limitations period prescribed by Texas law. The "equal treaty rights" provision cannot reasonably refer to the existence of a similar cause of action in the decedent's or injured party's country. First, no international treaty would ordinarily be expected to assure substantive rights to sue for death and personal injuries. Second, had the Legislature intended to condition the right to sue in Texas on the existence of such a cause of action under the law of the country where the decedent or injured party held citizenship, the Legislature could have specifically provided for this requirement, as it did when it required that the place of injury provide for such an action. Nor can the "equal treaty rights" provision reasonably refer to matters unrelated to lawsuits, such as trade, protection of investments, or other economic relations between countries. In the absence of some indication to that effect, we would not conclude that the Legislature intended to condition access to Texas courts on these irrelevant factors.

Absent any other reasonable construction, the most plausible reading of the "equal treaty rights" provision is that the Legislature intended to condition a foreign citizen's right to sue on personal injury or death claims on the right of a United States citizen, grounded in a treaty, to go into the courts of the decedent's or injured party's country of citizenship and pursue a personal injury or death claim to the same extent that a citizen of that country could do so. As we noted earlier, "equal treaty rights" does not mean that the foreign country must provide the same substantive rights, procedures, or remedies as Texas law. The provision simply means that the foreign country's law must, based on a treaty, afford United States citizens access to its courts to pursue any remedies available to its own citizens for personal injury or wrongful death.

To establish "equal treaty rights," therefore, plaintiff must first prove that the decedent's or injured party's country of citizenship is a party to a treaty guaranteeing United States citizens equal access to and treatment in the foreign country's courts. As treaties are to be construed broadly, the treaty need not provide explicitly for equal court access; it need only imply it. *See Asakura v. City of Seattle*, 265 U.S. 332, 342, 44 S.Ct. 515, 68 L.Ed. 1041 (1924). Therefore, treaty language providing for general due process protections or otherwise suggesting that the country's courts will be open to United States citizens will suffice.

Because we assume that other countries would interpret a treaty in the same way as we, the production of such a treaty raises a presumption that the plaintiff has established "equal treaty rights." But this presumption is rebuttable. After all, section 71.031 does not merely require the existence of a treaty, but "equal treaty *rights.*" Just because a country has signed a treaty that we would construe as granting United States citizens equal court access, that country does not have "equal treaty *rights* " with the United States if it has not construed the treaty to provide such access or its domestic law does not otherwise provide for equal access for United States citizens. Therefore, a defendant may rebut the presumption by producing evidence that, under the foreign country's law, United States citizens do not have equal access to courts. As with most presumptions, once the defendant

has raised such an issue, the burden reverts to the plaintiff to establish that the law of the foreign country does indeed provide United States citizens with such access. *See Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517–18 (Tex.1997); *Goode v. Shoukfeh,* 943 S.W.2d 441, 445–46 (Tex.1997); *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex.1993) (all applying similar shifts of burden regarding presumptions in other contexts).

■■■ In determining whether the foreign country affords United States citizens equal court access, a court must look only to the law of the foreign country, not to its actual application. This limitation comes not from Texas law, but from the constitutional structure of our federal system. In *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), the United States Supreme Court held that state courts cannot look behind a foreign country's law to determine whether its government actually provides United States citizens with the rights that its law claims it does. The Court explained that "minute inquiries concerning the actual administration of foreign law ... [and] the credibility of foreign diplomatic statements" are the kinds of "matters which the Constitution entrusts solely to the Federal Government." *Id.* at 435–36, 88 S.Ct. 664. But the Court also stated that statutes merely requiring a "routine reading of foreign laws" to determine whether those laws theoretically provide reciprocal rights for United States citizens do not unconstitutionally encroach on the federal domain over foreign affairs. *Id.* at 433, 88 S.Ct. 664; *see also Clark v. Allen,* 331 U.S. 503, 516–17, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947). As we presume that the Legislature intended section 71.031 to comport with the Constitution, *see* TEX. GOV'T CODE § 311.021(1), a court must limit its inquiry under the statute to whether the law of the foreign country in theory provides United States citizens with "equal treaty rights."

■■■ A court should determine this question the same way it would determine any other question of foreign law. *See* TEX.R. EVID. 203 (establishing the procedure for determining foreign law). To assist in this determination, the parties may produce or the court may consider sua sponte any source, including affidavits and testimony of foreign law experts, treatises and other secondary sources, interpretations of the foreign country's law by federal courts or agencies, and the foreign country's primary legal materials—statutes, codes, case law, court rules, legally binding executive proclamations, or any other legally authoritative documents. *See id.* Under *Zschernig,* however, the court may not determine whether the foreign country's government in fact denies to United States citizens the rights that its law provides them in theory. *See Zschernig,* 389 U.S. at 434, 439–41, 88 S.Ct. 664.

## IV.

■■■ The Kazis contend that eight different treaties, to which the United States and India are signatories, satisfy the "equal treaty rights" requirement of subsection (a)(3): (1) The Warsaw Convention, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11; (2) The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3; (3) The Convention to Regulate Commerce, July 3, 1815, U.S.-U.K., 8 Stat. 228; (4) The Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487; (5) Convention Relating to Tenure and Disposal of Real and Personal Property, Mar. 2, 1899, U.S.-U.K., art. V, 31 Stat. 1939, 1940; (6) Income Tax Treaty, April 12, 1989, U.S.-India, T.I.A.S. No. 11771; (7) The United Nations Charter, as supplemented by the Universal Declaration, June 26, 1945, 59 Stat. 1031, T.S. 993; and (8) The International Covenant on Civil and Political Rights, *adopted by the U.N. General Assembly* Dec. 16, 1966, art. 14(1), 999 U.N.T.S. 171, 176, *reprinted in* 6 I.L.M. 368 (entered into force Mar. 23, 1976) (ratified by the United States Sept. 8, 1992)

("Covenant"). The Kazis primarily rely on article 14(1) of the International Covenant on Civil and Political Rights, on which the court of appeals based its holding. The article provides in relevant part:

> All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law....

Covenant, art. 14(1).

Article 14(1) requires all signatory countries to confer the right of equality before the courts to citizens of all other signatories. As the Human Rights Committee of the Covenant commented: "[Article 14(1) is] aimed at ensuring the proper administration of justice, and to this end uphold[s] a series of individual rights such as equality before the courts and tribunals and the right to a fair and public hearing by a competent, independent and impartial tribunal established by law." HUMAN RIGHTS COMMITTEE OF THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, GENERAL COMMENT 13(1), U.N. Doc. HR1 GEN Rev.1 (1984) ("GENERAL COMMENT").[10] The Covenant not only guarantees foreign citizens equal treatment in the signatories' courts, but also guarantees them equal access to these courts. Such a guarantee is evident in article 14(1)'s language entitling "everyone" to a "fair and public hearing" for the "determination ... of his rights and obligations in a suit at law." Covenant, art. 14(1). This language suggests that United States citizens will be able to pursue any remedies available in India's courts, including those for personal injury and wrongful death.

Defendants contend that article 14(1) cannot confer "equal treaty rights" because it is "devoted almost entirely to due process for criminal procedure and reference to any arguably non-criminal matter is so brief and at a level of such generality as to be meaningless absent legislative implementation." We disagree. Article 14's reference to "the determination of any criminal charge against him, *or of his rights and obligations in a suit at law*" evidences that the treaty contemplates both criminal and civil proceedings. Covenant, art. 14(1) (emphasis added). Furthermore, the comments of the Human Rights Committee illustrate that "article 14 applies not only to procedures for the determination of criminal charges against individuals but also to procedures to determine their rights and obligations in a suit at law." GENERAL COMMENT 13(2).[11]

Defendants and Amicus Curiae Aviateca, S.A. also argue that the Covenant cannot provide for "equal treaty rights" with all 140 signatory countries because diplomatic

---

**10.** The Human Rights Committee of the Covenant was established by the Covenant and is composed of nationals of the States Parties. Covenant, art. 28(2), 999 U.N.T.S. at 195. The United States has declared that "it accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims that another State Party is not fulfilling its obligations under the Covenant." *U.S. Reservations, Understandings, and Declarations to the International Covenant on Civil and Political Rights*, 138 CONG. REC. S4781, S4784 (April 2, 1992).

**11.** Defendants also argue that article 14(1) cannot be a basis for "equal treaty rights" because the Senate, in ratifying it, issued a Declaration that its first twenty-seven articles were not self-executing. *U.S. Reservations, Understandings, and Declarations to the International Covenant on Civil and Political Rights*, 138 CONG. REC. S4781, S4784 (April 2, 1992). Because of this Declaration, defendants claim that the treaty confers no rights on Indian citizens in United States courts. Whatever the merits of this claim, it is irrelevant to the determination of the "equal treaty rights" issue. Under our construction of the "equal treaty rights" requirement, the only issue is whether—based on a treaty—Indian law allows United States citizens to pursue claims for personal injury or death to the same extent that it allows Indian citizens to pursue these claims. Because our focus is on the rights of United States citizens in Indian courts, we need not consider whether or not the Covenant grants rights to Indian citizens in the courts of this country.

relations with some of the signatories, including Nicaragua, Iraq, and Libya, have been subsequently severed. Severance of diplomatic relations may be evidence that a country does not provide United States citizens with equal access to its courts and may thus rebut the presumption that the Covenant provides "equal treaty rights." However, because there is no evidence that diplomatic relations with India have been severed, we need not explore this contention here.

Because the language of the Covenant provides for equal access to courts and equal treatment in civil proceedings, it satisfies the Kazis' initial burden of establishing "equal treaty rights." Under the procedure we authorize today, however, the defendants can still put this requirement at issue by producing evidence that, under Indian law, these rights do not exist. Accordingly, we express no opinion regarding whether the Kazis will ultimately meet their burden of proving this statutory condition. Because the plaintiffs have satisfied their initial burden of establishing that India provides "equal treaty rights" to United States citizens, however, we affirm the court of appeals' judgment reversing the trial court's order and remanding this case to that court.

Justice ENOCH did not participate in the decision.