**ONCOR ELECTRIC DELIVERY COMPANY LLC, Appellant,**

v.

**CHAPARRAL ENERGY, L.L.C., Appellee.**

No. 08–13–00159–CV

Court of Appeals of Texas, El Paso.

January 13, 2016

Hon. Robert K. Wise, Lillard Wise Szygenda PLLC, Dallas, TX, for Appellant.

Robert J. Witte, Dallas, TX, for Appellee.

Before McClure, C.J., Rodriguez, and Ferguson, JJ.

## *OPINION*

ANN CRAWFORD McCLURE, Chief Justice

Oncor Electric Delivery Company LLC appeals a judgment entered against it following a jury trial on a breach of contract claim. For the reasons that follow, we affirm.

## FACTUAL SUMMARY

This lawsuit arises from an agreement between Oncor and Chaparral Energy LLC for the construction of equipment necessary to provide electricity to two oil wells situated in Loving County. Oncor is a transmission-and-distribution electric utility regulated by the Public Utility Commission of Texas (PUC). Chaparral is an independent oil and gas production company which operates the two wells. Chaparral requested Oncor to supply electricity to the wells. This required the construction of electrical infrastructure. Chaparral hired a third party to construct electrical facilities from the wells to a tie-in point, and Oncor was responsible for extending its own electrical infrastructure to that point. Before Oncor could begin its work, it needed to obtain two easements from third-parties who owned the land between Oncor's existing infrastructure and the tie-in-point. There were significant delays in obtaining these easements, however, resulting in the project not being completed until January of 2009—more than thirteen months after Oncor and Chaparral entered into their agreement. During the interim, Chaparral was—at substantial expense—using generators to power its wells. After the easements were obtained and the electrical project was finally completed, Chaparral sued Oncor for breach of contract, seeking to recover the additional costs it had incurred by relying on generators. The jury found that Oncor failed to timely comply with its agreement to provide electricity to the oil wells and awarded Chaparral damages and attorneys' fees.

## THE DOCUMENTS AT ISSUE

There are two critical documents at issue: a letter agreement executed between the parties on November 6, 2007 (Agreement), and Oncor's tariff (Tariff). Per Section 32.101 of the Public Utility Regulatory Act (PURA), an electric utility like Oncor must file a tariff with the PUC. Tex.Util.Code Ann. § 32.101(a). The PUC then approves the tariff, which governs the terms and conditions of the services that the utility provides to the public. *Southwestern Bell Telephone Co. v. Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

### *The Agreement*

By letter dated September 28, 2007, Israel Fuentes, a senior project designer for Oncor, solicited an agreement with Chaparral to "provide additional electric facilities sufficient to provide electric service" for the oil wells. The agreement then provided two requirements:

> Pursuant to Company's Tariff for Retail Delivery Service, Customer is responsible for $22,327.00 as payment for the Customer's portion of the cost of installation of Company's additional electric delivery facilities, such payment to be and remain the property of the Company. Customer's payment in full is due at the time this agreement is returned to Company.

> Please be aware that the start date of this project will be no earlier than two weeks preceding the execution of this agreement along with any payment that may be required to Company's Tariff for Retail Delivery Service. **A more definitive installation schedule will be provided upon your delivery of this agreement and payment to assist in your planning for this project.** (Emphasis added).

Chaparral executed the agreement on November 6, 2007 and returned it with a check in full payment of the costs. Oncor received the payment no later than November 28, 2007. Chaparral fully complied with the agreement, but Oncor

wholly failed to provide "a more definitive installation schedule" as it was required to do.

### *The Tariff*

Chapter 3 of the Tariff is entitled General Service Rules & Regulations.

#### 3.1. APPLICABILITY

\* \* \*

Company will use **reasonable diligence** to comply with the operational and transactional requirements and timelines for provision of Delivery Service as specified in this Tariff and to comply with the requirements set forth by Applicable Legal Authorities to effectuate the requirements of the tariff.

\* \* \*

#### 3.12. GOOD-FAITH OBLIGATION

Company, Competitive Retailer, and Retail Customer will cooperate in good-faith to fulfill all duties, obligations, and rights set forth in this Tariff. Company, Competitive Retailer, and Retail Customer will negotiate in good-faith with each other concerning the details of carrying out their duties, obligations, and rights set forth in this Tariff.

\* \* \*

Chapter 5 encompasses the service rules and regulations for retail customers.

#### 5.7.3 PROCESSING OF REQUESTS FOR CONSTRUCTION OF DELIVERY SYSTEM

Requests for new residential Delivery Service requiring Construction Service, such as line extensions, shall be completed within 90 days of execution of the Facility Extension Agreement, or within a time period agreed to by the entity requesting the Construction Service and Company, and after the entity requesting Construction Service has made satisfactory payment arrangements for Construction Service Charges. For all other extensions requiring construction, requests should be completed within the time estimated by Company. For the purposes of this section, facility placement that requires a permit for a road or railroad crossing will be considered a line extension. **Unless mutually agreed to by Company and Retail Customer, within ten Business Days of Company's receipt of a detailed request, Company shall give the entity requesting Construction Service an estimated completion date and an estimated cost for all charges to be assessed.** (Emphasis added).

Clearly, the agreement between Oncor and Chaparral involved retail service rather than residential service such that the ninety day time frame does not apply. But that does not end the inquiry. Unless the parties agreed otherwise, Oncor was required by the Tariff to give Chaparral an estimated completion date. The Tariff does not require that Chaparral specifically request it, in writing or otherwise. Nor does the duly executed Agreement. Reading the Agreement and the Tariff together, once Oncor received a detailed request for services from Chaparral, Oncor was required to deliver an estimated completion date within ten days. Oncor's arguments are premised on its position that it could not deliver an estimated completion date until the necessary easements were obtained. There was competing evidence on this issue of delay, which the jury resolved in Chaparral's favor.

### THE PLEADINGS

Chaparral filed suit for breach of contract. The first amended petition was the live pleading at trial:

Oncor and Chaparral were parties to the Service Agreement, which constituted a binding contract. Chaparral paid Oncor $22,327, as the Service Agreement required, via the November 2007 Check.

Despite accepting and negotiating the Check, Oncor did not even begin to perform its obligations under the Service Agreement for an entire year. Further, Oncor repeatedly misled Chaparral regarding the purported reasons for its non-performance. Oncor's failure to timely perform has caused Chaparral to incur significant financial damages. Without electrical power, Chaparral could not operate the Haley Wells. Absent Chaparral's extensive mitigation efforts, the damages caused by Oncor's breach of the Service Agreement would have been significantly higher.

Oncor has no lawful excuse or justification for its failure to timely perform its obligations under the Service Agreement. Oncor did not cooperate in good faith to fulfill its duties and obligations under the Service Agreement, and Oncor's failure to discharge its responsibilities in a neutral matter burdened Chaparral. Oncor did not use reasonable diligence, nor did Oncor act in a matter consistent with good business practices, reliability, safety, and expedition. In fact, Oncor admits that it knowingly waited for months to send out the draft Haley and Harrison easements while misrepresenting to Chaparral the status of its work on those easements. Oncor has thus engaged in intentional misconduct. Further, Oncor had actual awareness of not only the risk—but the reality—that its nonperformance would cause Chaparral significant financial harm, but nonetheless proceeded with a conscious indifference to Chaparral's rights. Oncor's conduct was thus grossly negligent.

## ISSUES FOR REVIEW

Oncor presents two issues for review. First, it complains that Chaparral's claim amounts to a breach of implied covenant, not a breach of contract, because there is no express project completion deadline contained in either the Tariff or the Agreement. Oncor contends that the claim is therefore barred as a matter of law by the "filed-rate doctrine," which prohibits claims that expand or conflict with the provisions of a regulated utility's filed tariff.[1] Second, Oncor maintains that Chaparral's claim is barred as a matter of law by the Tariff's limitation of liability provision. Just prior to submission on oral argument Oncor raised a new challenge, alleging that the PUC has exclusive jurisdiction over Chaparral's breach of contract claim. We granted Oncor's motion to reschedule oral argument to allow the parties to fully brief this newly-presented jurisdictional issue.

## EXCLUSIVE JURISDICTION OR PRIMARY JURISDICTION?

The existence of subject matter jurisdiction is a question of law. *City of Dallas v. Carbajal*, 324 S.W.3d 537, 538 (Tex.2010). Subject matter jurisdiction challenges cannot be waived and may be raised for the first time on appeal. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex.2000). The Texas Constitution gives district courts jurisdiction over "all actions" unless "exclusive" jurisdiction is "conferred by this Constitution or other law on some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. District courts are courts of general jurisdiction and generally have subject matter jurisdiction absent a showing to the contrary. *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex.2004)(orig.proceeding), *citing Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex.2000). A similar presumption does not exist for administra-

1. *See, e.g., Southwestern Elec. Power Co. v.* Grant, 73 S.W.3d 211, 216 (Tex. 2002).

tive agencies, which may exercise only the powers conferred upon them "in clear and express statutory language." *Id. citing Subaru of Am. v. David McDavid Nissan,* 84 S.W.3d 212, 220 (Tex.2002).

■ An administrative agency has exclusive jurisdiction only when the Legislature has granted it *sole* authority to make an initial determination in a dispute. *In re Entergy Corp.,* 142 S.W.3d at 321–22. If an agency has exclusive jurisdiction, a party typically must exhaust all administrative remedies before seeking judicial review. *David McDavid Nissan,* 84 S.W.3d at 221; *Cash America Int'l, Inc. v. Bennett,* 35 S.W.3d 12, 18 (Tex.2000). But a frequent source of confusion is the distinction between exclusive jurisdiction and the judicially-created doctrine of *primary jurisdiction. Id.* at 220–21.

■ Exclusive jurisdiction and primary jurisdiction are different doctrines with different consequences. *Id.* at 220, *citing Lopez v. Public Util. Comm'n,* 816 S.W.2d 776, 782 (Tex.App.—Austin 1991, writ denied). Unlike exclusive jurisdiction, which is a jurisdictional grant to the exclusion of other bodies, primary jurisdiction allocates power between courts and agencies when *both* have authority to make initial dispute determinations. *Id.* at 221, *citing Foree v. Crown Cent. Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968). In other words, "primary jurisdiction is prudential whereas exclusive jurisdiction is jurisdictional." *Id.* at 220. Trial courts are required to defer to the administrative agency "only when the claim's enforcement requires the resolution of issues that are 'within the special competence of an administrative agency....'" *Cash America,* 35 S.W.3d at 18, *quoting Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 735 S.W.2d 663, 669–70 n.3 (Tex.App.—Austin 1987, no writ). In such cases, the court should abate the suit until the agency has

an opportunity to act on the matter. *David McDavid Nissan,* 84 S.W.3d at 221. But unlike exclusive jurisdiction, which implicates subject matter jurisdiction and thus cannot be waived, primary jurisdiction, which is not jurisdictional (despite the confusing nomenclature), *can* be waived. *Ellis v. Reliant Energy Retail Services, L.L.C.,* 418 S.W.3d 235, 245 (Tex.App.— Houston [14th Dist.] 2013, no pet.). *See also David McDavid Nissan,* 84 S.W.3d at 220; and Tex.R.App.P. 33.1(a).

■ In support of its assertion that the PUC has exclusive jurisdiction to adjudicate Chaparral's claim, Oncor relies on Section 17.157 of the PURA. *See* Tex.Util. Code Ann. § 17.157. This section sets out the PUC's authority to determine disputes: "the commission *may* resolve disputes between a retail customer and ... [an] electric utility." *Id.* (emphasis added). When construing a statute, "[o]ur primary objective," is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). As Chaparral notes, the Legislature's use of the permissive term "may" is incompatible with the concept of exclusive jurisdiction. "'May' creates discretionary authority or grants permission or a power," whereas the terms "shall" and "must" convey mandatory conditions. Tex. Gov't Code Ann. §§ 311.016(1), (2), and (3). Section 17.157's discretionary language does not clearly and expressly grant the PUC sole authority to make an initial determination in the instant dispute. Tex. Util.Code Ann. § 17.157; *In re Entergy Corp.,* 142 S.W.3d at 321–22.

Because Section 17.157 does not confer exclusive jurisdiction on the PUC, the presumption in favor of the trial court's jurisdiction survives. *In re Entergy Corp.,* 142 S.W.3d at 322; Tex. Const. Art. V, § 8. Consequently, the trial court and the PUC

had concurrent jurisdiction to determine the parties' dispute until the doctrine of primary jurisdiction established that the court was required to defer to the PUC. *Cash America*, 35 S.W.3d at 18. But Oncor did not raise a primary jurisdiction argument (or any other sort of argument regarding the PUC's authority) in the trial court. It therefore failed to preserve this issue for appeal. *Ellis*, 418 S.W.3d at 245; Tex.R.App.P. 33.1(a).

Oncor also relies on Section 32.001 of the PURA, which is the statute that conveys the PUC's general regulatory jurisdiction over electric utilities. *See* Tex. Util.Code Ann. § 32.001. Specifically, Section 32.001 gives the PUC "exclusive original jurisdiction over the rates, operations, and services" of electric utilities." *Id.* But the PUC's power to resolve individual utility customer disputes, which is discretionary, arises from Section 17.157. Tex.Util.Code Ann. § 17.157. And as Oncor concedes, the PUC does not have the power to award Chaparral the relief it seeks—money damages. Granted, this alone is not enough to defeat primary jurisdiction:

> Because the purpose of the [primary jurisdiction] doctrine is to assure that the agency will not be bypassed on what is especially committed to it, and because resort to the courts is still open after the agency has acted, the doctrine applies even if the agency has no jurisdiction to grant the relief sought.

*Foree v. Crown Petroleum Corp.*, 431 S.W.2d 312, 316 (Tex.1968). But again, Oncor has not preserved a primary jurisdiction argument.[2]

Oncor also relies on to two recent decisions by our sister courts holding that Section 32.001 gives the PUC exclusive jurisdiction to make dispute determinations. *See Oncor Elec. Delivery Co. LLC v. Giovanni Homes Corp.*, 438 S.W.3d 644,659–60 (Tex.App.—Fort Worth 2014, pet. filed); and *City of Houston v. CenterPoint Energy Houston Elec., LLC*, No. 01–11–00885–CV, 2012 WL 6644982, at *6 (Tex.App.—Houston [1st Dist.] Dec. 20, 2012, no pet.)(mem.op.). Neither of those cases addresses the distinction between primary and exclusive jurisdiction, however. Likewise, neither case considers the filed-rate doctrine, which is precisely where our case turns. We accordingly deny Oncor's jurisdictional challenge.

## THE FILED–RATE DOCTRINE

 The filed-rate doctrine applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided. *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 579, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *Grant*, 73 S.W.3d at 216. A tariff that is filed with and approved by an administrative agency under such a statutory scheme is presumed reasonable unless a litigant proves otherwise.[3]

**2.** Momentarily setting Oncor's waiver aside, we note that an agency's inability to grant money damages does divest it of exclusive jurisdiction to adjudicate claims when it also lacks authority to enter findings that would be essential to establishing the claim. *Foree*, 431 S.W.2d at 316. Oncor has not demonstrated that the PUC has express authority to make such findings. Further, this sort of adjudicative power does not flow from the PUC's general regulatory power. *Id.* at 317 (holding that an agency's power to promulgate rules

and regulations is insufficient to vest it with exclusive jurisdiction to enter findings regarding a regulated entity's past conduct—an express legislative grant of such authority is instead required). *See also Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 791–92, 800 (Tex. App.—Corpus Christi 2006, pet. denied).

**3.** Chaparral does not contend that Oncor's Tariff is unreasonable, but only that the Tariff does not bar the breach of contract claim.

*Grant,* 73 S.W.3d at 216, *citing Western Union Tel. Co. v. Esteve Bros. & Co.,* 256 U.S. 566, 572, 41 S.Ct. 584, 65 L.Ed. 1094 (1921). Accordingly, filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside. *Id.* at 217, *citing Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 162–63, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Carter v. AT & T Co.,* 365 F.2d 486, 496 (5th Cir.1966); and *Metro–Link Telecom,* 919 S.W.2d at 692.

■■■■■ The filed-rate doctrine forbids a regulated utility from favoring or discriminating against its individual customers by varying its services, rates, or any other term of its tariff. *Id.*; *Metro–Link Telecom,* 919 S.W.2d at 692. Similarly, a utility's obligations to its customers cannot be held to exceed those specifically enumerated in its tariff. *Id. citing Texaco Inc. v. Central Power & Light Co.,* 955 S.W.2d 373, 377 (Tex.App.—San Antonio 1997, pet. denied); *Central Power & Light Co. v. Romero,* 948 S.W.2d 764, 767 (Tex. App.—San Antonio 1996, writ denied); and *Arkansas La. Gas,* 453 U.S. at 577–78, 101 S.Ct. 2925. Consequently, the doctrine prohibits courts from awarding relief against a utility that contradicts, expands, or varies from the terms of the utility's filed tariff. *Id., citing Henderson v. Central Power & Light Co.,* 977 S.W.2d 439, 447 (Tex.App.—Corpus Christi 1998, pet. denied). Whether the filed tariff doctrine shields a utility from liability is a question of law and is subject to *de novo* review. *Metro–Link Telecom, Inc.,* 919 S.W.2d at 693.

■■■ The critical question is whether Chaparral's claim that Oncor failed to timely complete its obligation to provide electricity improperly conflicts with or expands the terms of the Tariff. *Grant,* 73 S.W.3d at 217. Oncor contends that the gist of Chaparral's complaint is not a breach of contract, but a breach of implied warranty that it complete construction of the facilities within a reasonable time. Chaparral counters that Oncor's breach occurred under the terms of the Agreement, and the jury was so charged.[4]

**QUESTION NO. 1**

Did Oncor fail to timely comply with its November, 2007 Agreement to provide Chaparral with electrical facilities sufficient to provide electric serve to Chaparral's point of delivery on the Haley Lease?

> Compliance with an agreement must occur within a reasonable time under the circumstances. A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing.

Answer 'Yes' or 'No'.

ANSWER: YES

Oncor did not object to this question. The Agreement specified that Oncor would provide a more definitive installation schedule upon delivery of the executed agreement and payment. The Tariff was even more specific, requiring Oncor to give the Chaparral an estimated completion date within ten days of its receipt of a detailed re-

---

4. The Tariff permits Oncor and its customers to enter into separate "Service Agreements" that set forth with more detail certain terms, obligations and/or conditions of service pursuant to the provisions of the Tariff. The parties do not dispute that the Agreement constituted a Service Agreement.

quest. Those provisions are not implied warranties. But even Section 3.1 of the Tariff provides that Oncor will use reasonable diligence to comply with the operational and transactional requirements and timelines for provision of Delivery Service.

Given the express language of the Agreement and the Tariff, and Oncor's failure to object to the jury question which instructed that compliance with an agreement must occur within a reasonable time under the circumstances, we overrule Issue One.

### LIMITATION OF LIABILITY

■■ In Issue Two, Oncor contends that the Tariff bars Chaparral's contract claim and shields Oncor from responsibility for the damages caused by Oncor's breach of the Service Agreement. This contention stems from the following Tariff provision:

**5.2.1 LIABILITY BETWEEN COMPANY AND RETAIL CUSTOMERS**

This Tariff is not intended to limit the liability of Company or Retail Customer for damages except as expressly provided in this Tariff.

Company will make reasonable provisions to supply steady and continuous Delivery Service, **but does not guarantee the Delivery Service against fluctuations or interruptions.** Company will not be liable for any damages, whether direct or consequential, including, without limitation, loss of profits, loss of revenue, or loss of production capacity, **occasioned by fluctuations or interruptions** unless it be shown that Company has not made reasonable provision to supply steady and continuous Delivery Service, consistent with the Retail Customer's class of service, and in the event of a failure to make such reasonable provisions, whether as a result of negligence or otherwise, Company's liability shall be limited to the cost of necessary repairs of physical damage proximately caused by the service failure to those electrical delivery facilities of Retail Customer which were then equipped with the protective safeguards recommended or required by the then current edition of the National Electrical Code.

However, **if damages result from fluctuations or interruptions in Delivery Service that are caused by Company's or Retail Customer's gross negligence or intentional misconduct, this Tariff shall not preclude recovery of appropriate damages when legally due.** (Emphasis added).

"Delivery Service" is defined in Chapter 1 of the Tariff:

**DELIVERY SERVICE.** The service performed by Company pursuant to this Tariff for the Delivery of Electric Power and Energy. Delivery Service comprises Delivery System Services and Discretionary Services.

These two phrases, "Delivery System Services" and "Discretionary Services" are also defined in Chapter One:

**DELIVERY SYSTEM SERVICES.** Delivery Services whose costs are attributed to all Retail Customers that receive Delivery Service from Company and charged to Competitive Retailers serving Retail Customers under the Rate Schedules specified in Section 6.1.1, DELIVERY SYSTEM CHARGES. Delivery System Services are all Tariffed Delivery Services provided by Company that are not specifically defined as Discretionary Services.

**DISCRETIONARY SERVICES.** Customer-specific services for which costs are recovered through separately priced Rate Schedules specified in Chapter 6.

Oncor admits that "Discretionary Services" include "both the construction of the

facilities needed to deliver electricity and the delivery of electricity after the facility's construction is completed."

This lawsuit involves the construction of the facilities needed to deliver electricity. We agree with Chaparral that the Tariff expressly limits Oncor's liability only as to damages occasioned by fluctuations or interruptions. We also agree that until Oncor completed construction, there was nothing subject to fluctuation or interruption that would trigger the Tariff's liability limitation. Oncor attempts to characterize the "interruption" as the delay in obtaining the easements. This distorts the language of the Tariff. Chaparral's damages were not occasioned by an interruption in Delivery Services, but rather from Oncor's failure to timely perform. And the jury so found.

More persuasive still is Chaparral's argument concerning the PUC's definitions of "interruptions". It directs us to the PUC Substantive Rules codified in Title 16, Part II of the Texas Administrative Code. The Substantive Rules Applicable to Electric Service Providers is set forth in Chapter 25. Section 25.52, entitled "Reliability and Continuity of Service," was enacted pursuant to PURA § 38.005, and applies to all electric utilities. Section 25.52(b)(1) states:

> Every utility shall make all reasonable efforts to prevent interruptions of service. When interruptions occur, the utility shall re-establish service within the shortest possible time.

P.U.C. Subst. R. 25.52(b)(1). Section 25.52(c)(2) then explains that interruptions can be "forced," "scheduled," or arise from "outside causes," or "major events." Section 25.52(c)(3) defines "interruption, momentary" as "single operation of an interrupting device which results in a voltage zero and the immediate restoration of voltage." P.U.C. Subst. R. 25.52(c)(3).

Chaparral suggests that this definition acknowledges that electrical voltage must already be present—and thus subject to a voltage zero and the immediate restoration of voltage—before a momentary interruption can possibly exist.

We turn next to Section 25.52(c)(4), which defines "interruption, sustained" as "all interruptions not classified as momentary." P.U.C. Subst. R. 25.52(c)(4). Chaparral argues that had its damages resulted from an interruption in service, Oncor would have categorized the event as a "sustained interruption" pursuant to § 25.52(c)(4). Chaparral continues:

> If a 'sustained interruption' of service had actually occurred with respect to Oncor's performance under the Service Agreement, § 25.52(d) required Oncor to make and keep a detailed record of the interruption.

Specifically, § 25.52(d) provides:

> Each utility shall keep complete records of sustained interruptions of all classifications. These records shall show the type of interruption, the cause for the interruption, the date and time of the interruption, the duration of the interruption, the number of customers interrupted, the substation identifier, and the transmission line or distribution feeder identifier.

P.U.C. Subst. R. § 25.52(d). Chaparral correctly notes that Oncor offered no such records into evidence.

We thus conclude that the damages awarded to Chaparral are not a violation of the Tariff's limitation of liability. We overrule Issue Two and affirm the judgment of the trial court below.

Ferguson, J., sitting by assignment