**Affirmed and Opinion filed November 26, 2013.**



In the

# Fourteenth Court of Appeals

---

## NO. 14-12-00635-CV

---

## KEVIN ELLIS, Appellant

### v.

## RELIANT ENERGY RETAIL SERVICES, L.L.C., Appellee

---

**On Appeal from the Co. Civil Ct. at Law No. 3
Harris County, Texas
Trial Court Cause No. 985,781-002**

---

## O P I N I O N

Appellant, Kevin Ellis, challenges the trial court's summary judgment rendered in favor of appellee, Reliant Energy Retail Services, L.L.C. ("Reliant"), in Reliant's suit on a sworn account and quantum meruit claim against him. Ellis contends the trial court erred in granting traditional summary judgment because Reliant failed to present evidence that he engaged in meter tampering. Ellis also argues that the Public Utility Commission ("PUC") has exclusive or primary

jurisdiction over this dispute. Finally, Ellis argues that even if the summary judgment was otherwise proper, Reliant is limited to only 180 days' worth of damages. We affirm the judgment in part, reverse the judgment in part, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In its petition, Reliant asserted a claim for a suit on sworn account. Reliant alleged that it had provided goods and services to Ellis on an open account, and that Ellis accepted the goods and services and was bound to pay Reliant's designated charges, which Reliant contended were "reasonable and customary." Reliant alleged that Ellis owed it $19,645.34 for goods and services it had provided, after allowing for all just and lawful offsets, credits, and payments. Reliant attached to its petition invoices, which it contended set forth the goods and services, dates of performance, quantities, and the prices of the series of transactions, including a final invoice showing an amount due of $19,645.34. Reliant included allegations that the electric meter at the service address had been inspected and determined to have been tampered with. Reliant also stated a claim for quantum meruit, alleging that Ellis had received benefits without paying for them.

Ellis filed a verified answer, denying Reliant's allegations, the account set forth by Reliant, the amount due, and that proper offsets and credits had been given. Ellis further denied any knowledge of the operation, malfunctions, and working of the electric meter. Ellis asserted the affirmative defenses of statute of limitations, waiver, lack of standing, and further asserted that Reliant was required to plead and prove existence of a valid contract since its claim was actually for breach of contract. Ellis also asserted a counterclaim for a violation of section 17.46 of the Texas Deceptive Trade Practices Act ("DTPA").

2

Ellis then filed a motion to dismiss for lack of jurisdiction or, in the alternative, to abate.[1] Ellis asserted that the PUC's jurisdiction over the matter was exclusive or, at the least, primary. Ellis also argued that Reliant was not allowed to backbill him for more than 180 days under PUC substantive rule 25.480(e)(1) and the PUC's order interpreting that rule. Reliant answered Ellis's counterclaim with a general denial, and Ellis supplemented his answer to Reliant's claims to assert lack of jurisdiction.

Reliant moved for traditional summary judgment. In its motion, Reliant stated that Ellis had an account for electrical services at his Locke Lane address and that Reliant provided services to Ellis there from January 8, 2002, to July 8, 2009. On or about January 30, 2009, CenterPoint Energy Houston Electric, LLC ("CenterPoint"),[2] determined that the electric meter at the Locke Lane address was not properly recording electric service usage due to tampering or "diversion": "a trick outer seal and no inner seal, the disc looked jammed and the meter would start and stop." CenterPoint changed the meter and performed a "shop test" that confirmed tampering on the "old meter." CenterPoint then revised the kilowatt hours ("kWh") at the service address from December 7, 2006, to February 4, 2009, and issued "diversion rebilling" and labor and equipment charges to Reliant. Because of the meter tampering, Reliant billed Ellis $595.71 for electricity at the service address during this 26-month period. The service address residence is 1,998 square feet; Ellis's invoices during this time frame ranged from a low of $0.00 to a high of $188.96, with over 10 months where the invoices were less than $20.00. Based on CenterPoint's revised readings, Reliant first rebilled Ellis for updated use of electric consumption on June 3, 2009, and ultimately issued a final

---

[1] The only substantive subheading within Ellis's motion was entitled, "Plea to Jurisdiction." The trial court did not expressly rule on this motion.

[2] CenterPoint was never and is not a party.

invoice dated July 14, 2009, in the amount of $19,645.34. Reliant asserted that under the PUC's substantive rules, as well as CenterPoint's tariff, CenterPoint properly estimated usage and Reliant properly rebilled Ellis.

Reliant attached to its motion the affidavit of Eda Carola Mena, a Reliant supervisor for customer operations and a custodian of records, who testified that the "meter tampering" and "corrected" invoices attached to her affidavit accurately set forth the goods and services that were provided, the dates of performance, and the quantities, and "are just, that is, the usual, customary and reasonable prices for the series of transactions at the service address." Mena further testified that Reliant had performed all conditions precedent, all just and lawful offsets and credits had been applied, and Ellis "was in default under the terms of the sworn account by failing to make one or more payments as required thereunder." Also attached to Mena's affidavit was "CenterPoint's Field Service Report and Equipment Summary Report" and a comparison chart of the invoices. Reliant also attached to its motion an affidavit from its attorney detailing his $6,500 in reasonable attorney's fees.

In his response to Reliant's summary judgment motion, Ellis contended Reliant did not present evidence establishing that he tampered with the electric meter. Ellis also challenged Reliant's "guesstimation" and rebilling of his electric consumption as "presumptuous and not in accord with the procedure established by the [PUC]." Ellis asserted that an electric utility only is entitled to rebill after it meets its burden to establish "meter tampering." Ellis attached to his response his own affidavit wherein he averred that he "did not tamper with nor cause anyone to tamper with the electric meter attached to [his] house" and that he "was unaware

4

that there was a problem with the meter."[3]

The trial court granted Reliant's traditional motion for summary judgment.[4] Ellis filed a motion for rehearing. Reliant responded to Ellis's motion for rehearing, asserting he had not raised a fact issue but noting that Ellis's counterclaim still remained at issue. Reliant also filed a motion for no-evidence summary judgment on Ellis's DTPA claim, asserting Ellis had provided no evidence of the requisite element that Reliant provided false, misleading, or deceptive information. The trial court then denied Ellis's motion for rehearing, but signed an "Interlocutory Summary Judgment" that granted Reliant its traditional summary judgment. Ellis responded to Reliant's no-evidence motion, asserting that Reliant failed to properly maintain his electric meter, monitor his usage, bill him for services, and notify him of any problems. Ellis attached his same affidavit. The trial court signed a "Partial Summary Judgment" that rendered a "take nothing judgment" against Ellis.

In its "Final Judgment," the trial court ordered that Reliant recover from Ellis the outstanding principal balance of $19,645.34, as well as $6,500 in attorney's fees, plus conditional attorney's fees in the event of appeal, costs, and 5% in pre- and post-judgment interest. Ellis timely appealed.

In his appeal, Ellis presents three issues: (1) whether the trial court erred in granting Reliant's traditional summary judgment because Reliant failed to present evidence that Ellis engaged in meter tampering; (2) whether the trial court properly exercised jurisdiction over this dispute; and (3) even if granting summary judgment was otherwise proper, whether Reliant is limited to only 180 days' worth of

---

[3] Ellis also attached his affidavit to his motion to dismiss.

[4] The trial court stated that its summary judgment order disposed of all claims and parties, and was meant to be a final order.

5

backbilling as damages.

## II.     ANALYSIS

## A. Jurisdiction

To begin, we will consider Ellis's second issue—whether the trial court properly exercised jurisdiction over this matter.

### 1.  Standard of review

Subject matter jurisdiction may not be conferred or taken away by consent or waiver, and its absence may be raised at any time. *Carroll v. Carroll*, 304 S.W.3d 366, 367 (Tex. 2010) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993)). Whether a trial court has subject matter jurisdiction is a question of law we review de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002). We also review de novo the question of law of whether a pleader has alleged facts that affirmatively demonstrate subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We construe pleadings liberally in favor of the plaintiff and look to the pleader's intent. *See id.* (citing *Tex. Air Control Bd.*, 852 S.W.2d at 446).

### 2.  The PUC does not have exclusive jurisdiction.

Ellis argues that the PUC has exclusive jurisdiction over this account dispute between Reliant and Ellis pursuant to sections 31.001 and 32.001 of the Public Utility Regulatory Act ("PURA") and the Texas Supreme Court's decision in *In re Entergy Corp.*, 142 S.W.3d 316 (Tex. 2004) (orig. proceeding).

Before reviewing the specific sections cited by Ellis, we first recognize that at the time of filing the Harris County civil courts at law exercised concurrent jurisdiction with district courts in civil cases where the matter in controversy

6

exceeded $500 but did not exceed $100,000. *See* TEX. GOV'T CODE ANN. §§ 25.0003(c)(1), 25.1032 (West 2004). We also recognize the constitutional presumption that district courts are authorized to resolve disputes. *Entergy*, 142 S.W.3d at 322 (discussing TEX. CONST. art. V, § 8). Moreover, district courts are courts of general jurisdiction and generally have subject matter jurisdiction absent a showing to the contrary. *Id.* (citing *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000)). Therefore, keeping these presumptions in mind, we determine whether the "Constitution or other law" conveys exclusive, appellate, or original jurisdiction on the PUC. *See Entergy*, 142 S.W.3d at 322 (citing TEX. CONST. art. V, § 8).

There is no presumption that administrative agencies have authority to resolve disputes. *Subaru of Am. v. David McDavid Nissan*, 84 S.W.3d 212, 220 (Tex. 2002). Administrative agencies may exercise only those powers the law confers upon them in clear and express statutory language and those reasonably necessary to fulfill a function or perform a duty that the Legislature has expressly placed with the agency. *Id.* (citations omitted); *Pub. Util. Comm'n v. GTE–Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995) (citations omitted). An agency has exclusive jurisdiction when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed. *David McDavid Nissan*, 84 S.W.3d at 221 (citation omitted). When an agency has exclusive jurisdiction, the trial court lacks subject matter jurisdiction and must dismiss the claims within the agency's exclusive jurisdiction. *See id.*

The Texas Supreme Court has explained that whether an agency has exclusive jurisdiction depends on statutory interpretation. *Id.* Whether an agency has exclusive jurisdiction thus is a question of law we review de novo. *Id.* at 222.

7

When construing statutes, our objective is to determine and give effect to the Legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003) (citing *State v. Gonzales*, 82 S.W.3d 322, 327 (Tex. 2002)). We look to the "plain and common meaning of the statute's words." *Id.* (citing *Gonzales*, 82 S.W.3d at 327). When a statute's meaning is unambiguous, we interpret such statute according to its plain language. *Id.* (citing *Gonzales*, 82 S.W.3d at 327).

> Section 31.001 of PURA, Legislative Findings; Purpose of Subtitle, states:
>
> This subtitle is enacted to protect the public interest inherent in the rates and services of *electric utilities*. The purpose of this subtitle is to establish a comprehensive and adequate regulatory system for *electric utilities* to assure rates, operations, and services that are just and reasonable to the consumers and to the *electric utilities*.

TEX. UTIL. CODE ANN. § 31.001(a) (West 2007) (emphases added). In addition, section 32.001 of PURA, Commission Jurisdiction, describes the PUC's jurisdiction as follows:

> Except as provided by Section 32.002 [governing municipally owned utilities], the Commission has exclusive original jurisdiction over the rates, operations, and services of an *electric utility* in:
>
> (1) areas outside a municipality; and
>
> (2) areas inside a municipality that surrenders its jurisdiction to the Commission under Section 33.002.

*Id.* § 32.001(a) (emphasis added). The *Entergy* court concluded that based on section 31.001's description of PURA as "comprehensive" and section 32.001's specific grant to the PUC of "exclusive original jurisdiction," the Legislature intended PURA to be the exclusive means of regulating electric utilities and thus the PUC had exclusive jurisdiction over the contract dispute "regarding utility rates, operations, and services" involving a newly-merged electric utility. 142

8

S.W.3d at 323.[5]

Reliant responds that according to PURA, it is not an electric utility, but rather a retail electric provider ("REP"). *See* TEX. UTIL. CODE. ANN. § 31.002(17) (West 2007) (defining "retail electric provider" as "a person that sells electric energy to retail customers in this state" but "does not own or operate generation assets"); *see also* 16 TEX. ADMIN. CODE § 25.5(115) (2010) (Pub. Util. Comm'n, Definitions) (defining "retail electric provider as "[a] person that sells electric energy to retail customers in this state" but "may not own or operate generation assets); 16 TEX. ADMIN. CODE § 25.107 (2009) (Pub. Util. Comm'n, Certification of Retail Electric Providers (REPs)) (defining "retail electric provider" as "[a] person that sells electric energy to retail customers in this state"). Reliant asserts that PURA's definition of "electric utility" expressly excludes "retail electric providers." *See* TEX. UTIL. CODE. ANN. § 31.002(6) & (6)(H) (defining "electric utility" as "a person or river authority that owns or operates for compensation in this state equipment or facilities to produce, generate, transmit, distribute, sell, or furnish electricity in this state" but does not include "retail electric providers"); *see also* 16 TEX. ADMIN. CODE § 25.5(41) & (41)(H) (same). Thus, Reliant argues that *Entergy* is inapplicable.

We agree with Reliant. While the plain language of sections 31.001 and 32.001 clearly expresses the Legislature's intent that PURA be the exclusive means of regulating, and the PUC exercise exclusive jurisdiction with regard to, *electric utilities*, *Entergy*, 142 S. W.3d at 323, the plain language of PURA's own definitions clearly expresses the Legislature's intent that REPs are not considered

---

[5] In addition to the statutory analysis, the *Entergy* court also considered that the contract at issue, a merger agreement among the parties, "importantly, was the basis for the PUC's regulatory approval of the . . . merger. . . . [T]he very administrative character that gives the Merger Agreement effect also gives the PUC the authority to adjudicate disputes arising from the agreement." 142 S.W.3d at 324.

to be electric utilities. Therefore, *Entergy*'s jurisdictional analysis does not control with regard to this case that solely involves a dispute between an REP and its customer.

Here, construing the petition in its favor, Reliant alleged facts indicating it is considered an REP and not an electric utility under PURA. Reliant alleged that it sold electrical goods and services to Ellis at a service address in Texas on an open account. Nothing in Reliant's petition indicates it owned or operated any equipment or facilities that would bring it within PURA's definition of an electric utility.[6] Further, in Ellis's motion to dismiss/plea to the jurisdiction, he expressly refers to Reliant as a "retail electric provider." Construing the PURA sections at issue and the facts as pleaded in Reliant's petition, we conclude that the PUC does not have exclusive jurisdiction over this particular dispute between REP Reliant and its customer Ellis.

### 3. Ellis failed to preserve his primary jurisdiction issue.

In the alternative, Ellis argues that the PUC has primary jurisdiction over this matter pursuant to section 17.157 of PURA, Disputes, and thus the trial court should have abated the matter. However, we conclude that Ellis has failed to preserve this issue for review.

The judicially-created doctrine of primary jurisdiction allocates power between courts and agencies when both have the authority to make initial determinations in a dispute. *David McDavid Nissan*, 84 S.W.3d at 221. Trial courts should defer to the appropriate administrative agencies when: (1) the agency is staffed with experts trained in handling complex problems within the agency's purview and (2) great benefit is derived from the agency's uniform interpretation

---

[6] Reliant alleged that it was a CenterPoint employee who inspected, removed, and changed the electric meter at Ellis's service address.

10

of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations. *Id.* When an agency has primary jurisdiction, abatement by the trial court is appropriate so that the agency has an opportunity to act on the matter. *Id.*

Despite similar terminology that has tended to confuse Texas courts, the exclusive jurisdiction and primary jurisdiction doctrines are "distinctly different doctrines." *Id.* at 220. Thus, the Texas Supreme Court holds that "primary jurisdiction is prudential whereas exclusive jurisdiction is jurisdictional." *Id.* In other words, primary jurisdiction, even where it properly applies, does not divest the trial court of its subject matter jurisdiction. *Apollo Enters., Inc. v. ScripNet, Inc.*, 301 S.W.3d 848, 871 (Tex. App.—Austin 2009, no pet.). Further, a trial court's decision to grant or deny a motion to abate is within the court's discretion. *Tex. Mut. Ins. Co. v. Sonic Sys. Int'l, Inc.*, 214 S.W.3d 469, 479, 483 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (concluding that continued abatement based on primary jurisdiction was abuse of discretion). Thus, unlike exclusive jurisdiction, which implicates subject matter jurisdiction and thus may be raised at any time, because primary jurisdiction is not jurisdictional, it may be waived. TEX. R. APP. P. 33.1(a); *see David McDavid Nissan*, 84 S.W.3d at 220.

The record reflects that the trial court did not rule on Ellis's motion to abate.[7] After the trial court granted Reliant's traditional motion for summary judgment, Ellis filed a motion for rehearing wherein he "re-urge[d]" abatement and noted the "pending" motion. However, the record does not reflect that Ellis ever

---

[7] The Texas Supreme Court has held that when a trial court rules on the merits of the case "without explicitly rejecting an asserted jurisdictional attack," the court "has implicitly denied the jurisdictional challenge." *Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006). However, despite the "jurisdiction" moniker, primary jurisdiction is not jurisdictional, and thus is not subject to implicit denial for purposes of rule 33.1. *See David McDavid Nissan*, 84 S.W.3d at 220.

commenced a hearing on his motion to abate. Nor does the record demonstrate that Ellis objected to the trial court's refusal to rule on his motion. Therefore, Ellis failed to preserve this issue for appellate review. *See Grace Interest, LLC v. Wallis State Bank*, —S.W.3d—, No. 14-12-00557-CV, 2013 WL 4604570, at *8 (Tex. App.—Houston [14th Dist.] Aug. 29, 2013, no. pet. h.) (concluding that abatement issue was waived).

Therefore, we overrule Ellis's second issue.

## B. Suit on sworn account

Reliant moved for traditional summary judgment on its sworn account and quantum meruit claims. The trial court granted summary judgment without specifying any underlying ground. We conclude that Ellis raised a fact issue on his limitations defense to preclude summary judgment on Reliant's sworn account claim.

### 1. Standard of review

We review the trial court's granting of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam). To be entitled to summary judgment under rule 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In particular, a plaintiff moving for summary judgment must conclusively prove all essential elements of its claim. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Gray v. Entis Mech. Servs., L.L.C.*, 343 S.W.3d 527, 529 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citation omitted). If the movant's motion and summary judgment evidence facially establish its right to judgment as

a matter of law, the burden shifts to the nonmovant to raise a material fact issue sufficient to defeat summary judgment. *Gray*, 343 S.W.3d at 529 (citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000)). "On appeal, the movant still bears the burden of showing there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing *Rhone–Poulenc, Inc.*, 997 S.W.2d at 223). We review the evidence presented in the motion and the response in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We will affirm if any of the summary judgment theories presented to the trial court and preserved for appellate review are meritorious. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996).

## 2. Sworn account requirements

To establish sufficient evidence to support summary disposition in a suit on sworn account, the movant must "strictly adhere" to the provisions outlined in the Texas Rules of Civil Procedure. *PennWell Corp. v. Ken Assocs., Inc.*, 123 S.W.3d 756, 765 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Powers v. Adams*, 2 S.W.3d 496, 498 (Tex. App.—Houston [14th Dist.] 1999, no pet.)). Rule 185 sets forth the criteria for a suit on account and defines an open account to include "any claim . . . for personal services rendered . . . ." TEX. R. CIV. P. 185. Thus, a plaintiff's petition on a sworn account must contain "a systematic, itemized statement of the goods or services sold, reveal offsets made to the account, and be supported by an affidavit stating the claim is within the affiant's knowledge, and that it is 'just and true.'" *PennWell Corp.*, 123 S.W.3d at 765 (citing *Powers*, 2 S.W.3d at 498).

Despite a defendant's sworn denial, a plaintiff may properly obtain a

13

summary judgment on its sworn account claim by filing "legal and competent summary judgment evidence establishing the validity of its claim as a matter of law." *Id.* (citation omitted). The elements of a sworn account are: (1) the sale and delivery of merchandise or performance of services; (2) that the amount of the account is "just," i.e., the prices charged are pursuant to an express agreement, or in the absence of an agreement, that the charges are usual, customary, or reasonable; and (3) that the outstanding amount remains unpaid. *Id.* at 766.

Mena professed her personal knowledge of all the facts set forth in her affidavit. Mena testified that Reliant provided Ellis with electrical services. She further stated that after CenterPoint—"the Transmission and Distribution Service Provider"—determined that the meter at Ellis's service address had not been properly recording electric service usage due to tampering or "diversion" and confirmed diversion through a "shop test," CenterPoint revised the kWh from December 7, 2006, to February 4, 2009. Reliant rebilled Ellis based on the corrected kWh and issued a final invoice on July 14, 2009, in the amount of $19,645.34. In addition to the final invoice and invoices reflecting usage since the meter was replaced in February 2009, attached to Mena's affidavit were the "meter tampering" invoices reflecting the invoices originally billed for usage from December 2006 to January 2009 and a comparison chart. Mena stated that the attached invoices accurately set forth the services, dates, quantities, and the "just, that is, the usual, customary and reasonable prices for the series of transactions at the service address" and that the outstanding amount was calculated after applying "all just and lawful offsets and credits." Mena testified that Reliant had performed all conditions precedent and was "entitled to collect the indebtedness arising thereunder." Mena also testified that Ellis "was in default under the terms of the sworn account." Thus, Reliant's motion and evidence facially established its right

to summary judgment on its sworn account as a matter of law, and the burden shifted to Ellis to raise a fact issue to defeat summary judgment.

### 3. Whether Ellis tampered with his meter does not raise a fact issue as to Reliant's sworn account claim.

In his first issue, Ellis argues that the trial court erred in granting summary judgment in favor of Reliant because Reliant failed to present any evidence to support its argument that he "was indebted to it as a result of meter tampering occasioned by [him]." Essentially, Ellis's position is that to sufficiently prove the elements of a suit on sworn account, Reliant had to prove that Ellis tampered with his meter or caused such tampering. Ellis submitted an affidavit with his response to Reliant's motion for summary judgment wherein he averred that he "did not tamper with nor cause anyone to tamper with the electric meter attached to [his] house."

We do not agree that whether Ellis engaged in any meter tampering implicates the first sworn account element—that Reliant provided electric service to Ellis. Whether Ellis engaged in or knew about meter tampering also does not correlate to the second sworn account element, the justness of the amount of the account. Nor does it bear on the third sworn account element—that Ellis had not paid the outstanding amount. Mena's affidavit and attached invoices constitute sufficient evidence that Reliant sold and delivered electric service to Ellis at the service address pursuant to his account with Reliant. This evidence also establishes that the prices charged in the invoices reflect the usual, customary, and reasonable prices for the revised electrical usage, and that Ellis did not pay the outstanding amount on the account.

Ellis's affidavit fails to controvert any of these elements. Although Ellis specifically denies ever tampering with the meter or causing anyone else to do so,

15

and professes that he was unaware of any meter problem, he does not place into issue that Reliant provided electric service pursuant to an account with him at the service address. And although Ellis states that he changed electric providers due to his outstanding balance with Reliant, he does not controvert the justness of the amount, or the existence, of such balance. Therefore, we overrule Ellis' first issue.

**4. Ellis has raised a fact issue as to his affirmative defense of limitations sufficient to defeat summary judgment on Reliant's sworn account claim.**

However, we conclude that whether Ellis engaged in meter tampering does implicate his affirmative defense of limitations.[8]

In his third issue, Ellis contends that, even if the trial court was correct in that Reliant otherwise was entitled to summary judgment on its claims, the court erred because it "ignored" the law by not limiting Reliant to 180 days' worth of backbilling damages. In his summary judgment response, as incorporated from his motion to dismiss, Ellis asserted that, pursuant to substantive rule 25.480(e)(1),[9] as interpreted by the PUC, Reliant was not allowed to backbill him for more than 180 days from the date of the issuance of the bill in which the underbilling occurred. Thus, Ellis relied on his affirmative defense of limitations to oppose Reliant's summary judgment motion. *See Tello v. Bank One, N.A.*, 218 S.W.3d 109, 114 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (nonmovant may rely on affirmative defense to oppose summary judgment motion). Ellis as nonmovant "is

---

[8] If the amount of Reliant's backbilling had not exceeded 180 days, whether Ellis raised a fact issue as to his tampering with the meter would not be relevant because under rule 25.480(e), so long as charges are found to be lower than authorized, an REP can backbill for up to 180 days. Ellis did not controvert that Reliant's charges reflected underbilling and were subject to correction.

[9] This rule is contained within subchapter R, "Customer Protection Rules for Retail Electric Service," of chapter 25, "Substantive Rules Applicable to Electric Service Providers," of title 16, part 2, of the Texas Administrative Code.

not required to prove the affirmative defense as a matter of law; raising a fact issue is sufficient to defeat summary judgment." *See id.*

Generally, we construe administrative rules, which have the same force as statutes, in the same manner as statutes. *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). In construing a PUC rule, our primary objective is to give effect to the PUC's intent. *See id.* One of the "dominant rules of construction" we apply "requires us to give 'serious consideration' to the '[c]onstruction of a statute by the administrative agency charged with its enforcement.'" *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (citing *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)). Section 17.003 of PURA, Customer Awareness, provides that the PUC "shall adopt and enforce rules to require . . . a retail electric provider, or an electric utility to give clear, uniform, and understandable information to customers about rates, terms, services, customer rights, and other necessary information as determined by the commission." TEX. UTIL. CODE ANN. § 17.003(c) (West 2007 & Supp. 2013). Section 17.004 of PURA, Customer Protection Standards, provides that the PUC "may adopt and enforce rules as necessary to carry out this section, including rules for minimum service standards for . . . a retail electric provider, or an electric utility." *Id.* § 17.004(b). Because the Legislature has conferred authority on and charged the PUC with enforcement of rules pertaining to information provided to and protection standards for customers, we will uphold its interpretation "so long as the construction is reasonable and does not contradict the plain language of the statute." *First Am. Title Ins.*, 258 S.W.3d at 632 (citing *Tarrant Appraisal Dist.*, 845 S.W.2d at 823); *see R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624–25 (Tex. 2011) (noting that "serious consideration" deference applies to "formal opinions adopted after formal

17

proceedings," where language at issue is ambiguous and agency's construction is reasonable); *see also* TEX. UTIL. CODE ANN. § 17.001(b) (West 2007) (conferring authority on PUC to adopt and enforce customer protection rules).

While both Reliant and Ellis point to various versions of the PUC's substantive rules as favoring their interpretation of what must be shown with regard to meter tampering for permissible rebilling, we attempt to construe the rules in effect at the time of Reliant's rebilling of Ellis, and to the extent necessary, CenterPoint's action in issuing diversion rebilling and related charges to Reliant.

Specifically, Ellis maintains that PUC substantive rule 25.126(b) places the burden of proof of meter tampering on the electric utility. Reliant does not dispute this burden of proof, which it cited in its summary judgment motion.

At the relevant time, rule 25.126 provided:

(a) For purposes of these sections, meter tampering, bypass, or diversion shall be defined as tampering with an electric utility company's meter or equipment, bypassing the same, or other instances of diversion, such as physically disorienting the meter; attaching objects to the meter to divert or bypass service; inserting objects into the meter; and other electrical and mechanical means of tampering with, bypassing, or diverting electrical service.

(b) The burden of proof of meter tampering, bypass, or diversion is on the electric utility. Photographic evidence or any other reliable and credible evidence may be used; however, any evidence must be accompanied by a sworn affidavit by the electric utility when any action regarding meter tampering as provided for in these sections is initiated. A court finding of meter tampering may be used instead of photographic or other evidence, if applicable. Meter tampering is a criminal offense outside the jurisdiction of the Public Utility Commission.

16 TEX. ADMIN. CODE § 25.126 (2009) (Pub. Util. Comm'n, Meter Tampering)

*repealed* 35 Tex. Reg. 4669 (2010) (proposed January 1, 2010).[10]

Ellis also asserts that, under rule 25.480(e)(1), and the PUC's interpretation of this rule as stated in its order in *Complaint of Sonya Pantoja against CenterPoint Energy and Reliant Energy*, PUC Docket No. 35455, 2008 WL 4870585 (Oct. 29, 2008) (slip op.), Reliant is limited to backbilling him for corrected charges for 180 days.[11]

At the relevant time, rule 25.480 provided:

(e) Underbilling by a REP.  If charges are found to be lower than authorized by the REP's terms and conditions of service, or if the REP fails to bill the customer for service, then the customer's bill may be corrected.

> (1) The customer shall not be responsible for corrected charges billed by the REP unless such charges are billed by the REP within 180 days from the date of issuance of the bill in which the underbilling occurred.  The REP may backbill a customer for the amount that was underbilled beyond the timelines provided in this paragraph if:
>
> > (A) the underbilling is found to be the result of meter tampering by the customer; or
> >
> > (B) the TDU bills the REP for an underbilling as a result of meter error as provided in § 25.125 of this title (relating to Adjustments Due to Meter Errors).

16 TEX. ADMIN. CODE § 25.480(e)(1) (2009) (Pub. Util. Comm'n, Bill Payment and Adjustments).

---

[10] Ellis also maintains that rule 25.126(b)(2) only permits a utility to backbill for six months if it discovers a non-compliant meter affected by meter tampering.  However, such time limitation is reflected in the current version of rule 25.126, effective July 1, 2010, not the version of rule 25.126 in effect at the time of the backbilling at issue.  16 TEX. ADMIN. CODE § 25.126(b)(2)(B) (2013) (Pub. Util. Comm'n, Adjustments Due to Non-Compliant Meters and Meter Tampering in Areas Where Customer Choice Has Been Introduced).

[11] Ellis attached this opinion to his motion to dismiss.

The plain language of subsection (e)(1)(A) requires that the underbilling must be found to be due to meter tampering "by the customer" for the 180-day time frame not to apply. *Id.* § 25.480(e)(1). Moreover, Reliant concedes in its brief that subsection (e)(1)(A) requires proof that Ellis was the actual person who tampered with the meter. In his affidavit, Ellis specifically denied having tampered with, or having caused anyone to tamper with, his meter. Thus, we agree with Ellis that he raised a fact issue as to whether he—"the customer"—tampered with the meter.

Instead, Reliant argues that subsection (e)(1)(B) does not require a showing that Ellis was the one who tampered with the meter. Reliant contends that pursuant to subsection (e)(1)(B), it was proper to backbill Ellis beyond the 180-day timeline where the TDU[12] (here, CenterPoint) billed the REP (Reliant) as a result of meter error as provided in PUC substantive rule 25.125 and as permitted by CenterPoint's tariff with Reliant. Reliant also asserts that the PUC's analysis in *Pantoja* only applies to backbilling under subsection (e)(1)(A) and, in any event, is not binding.

The PUC issued the *Pantoja* order after a hearing on a formal complaint filed by Sonya Pantoja against CenterPoint and Reliant. *Pantoja* presented virtually the same factual circumstances as here. There, starting in 2004, retail customer Pantoja's kWh readings dropped to only about 20% of her prior usage. *Pantoja*, 2008 WL 4870585, at *2. In February 2007, prompted by a showing of negative usage, CenterPoint performed a field test of Pantoja's meter, discovered

---

[12] A "transmission and distribution utility" ("TDU") is "a person or river authority that owns or operates for compensation in this state equipment or facilities to transmit or distribute electricity . . . ." TEX. UTIL. CODE ANN. § 31.002(19); 16 TEX. ADMIN. CODE § 25.5(139). Thus, a TDU falls within the definition of an electric utility. *See* TEX. UTIL. CODE ANN. §§ 31.002(6), 31.002(19); 16 TEX. ADMIN. CODE §§ 25.5(41), 25.5(139). Mena describes CenterPoint as the "Transmission and Distribution Service Provider" in her affidavit.

20

tampered jewels, and replaced the meter. *Id.* at *3. To correct for the underbilling, CenterPoint estimated and issued revised kWh readings for the period of January 15, 2004, to February 19, 2007. *Id.* CenterPoint submitted adjusted billing for that period to Pantoja's REP Reliant, and Reliant backbilled Pantoja for the underbilling, which "was the result of meter tampering." *Id.* Pantoja argued that Reliant had wrongfully issued corrected bills covering a three-year period for electricity consumption at her service address. *Id.* at *1.

The PUC decided, first, it was not appropriate to apply the penal code presumption that the person who economically benefits from meter tampering knowingly tampered with the meter. *Id.*; *see* TEX. PENAL CODE ANN. § 28.03(c) (West 2011) (Criminal Mischief offense). The PUC then specifically stated rule 25.480(e)(1) required "that CenterPoint and Reliant present evidence sufficient to establish that the meter tampering was attributable to Ms. Pantoja." *Pantoja*, 2008 WL 4870585, at *1. The version of rule 25.480(e)(1) interpreted by the PUC in *Pantoja* included the same exact language as the version applicable in this case.[13]

---

[13] The version of rule 25.480 applicable in *Pantoja* provided, in relevant part:

(e) Underbilling by a REP. If charges are found to be lower than authorized by the REP's terms and conditions of service, or if the REP fails to bill the customer for service, then the customer's bill may be corrected.

> (1) The customer shall not be responsible for corrected charges billed by the REP unless such charges are billed by the REP within 180 days from the date of issuance of the bill in which the underbilling occurred. The REP may backbill a customer for the amount that was underbilled beyond the timelines provided in this paragraph if:
>
> > (A) the underbilling is found to be the result of meter tampering by the customer; or
> >
> > (B) the TDU bills the REP for an underbilling as a result of meter error as provided in § 25.125 of this title (relating to Adjustments Due to Meter Errors).

16 TEX. ADMIN. CODE § 25.480(e)(1) (2007) (Pub. Util. Comm'n, Bill Payment and Adjustments).

Because the evidence did not establish that Pantoja tampered with her meter, although both CenterPoint and Reliant calculated the adjusted usage and underbilling properly, Pantoja was "not responsible for corrected charges billed by Reliant unless such charges are billed within 180 days from the date of issuance of the bill in which the underbilling occurred." *Id.* at *3–4. Thus, Reliant was only permitted to backbill Pantoja for the 180 days before it issued its first bill with corrected charges.[14] *Id.* at *4.

We do not agree with Reliant that *Pantoja* limited its analysis to subsection (e)(1)(A), particularly where the factual circumstances, as here, also reflected that CenterPoint as TDU had issued REP Reliant a bill for underbilling. Unless we conclude that the PUC's interpretation of rule 25.480(e)(1) in *Pantoja* is unreasonable or inconsistent with the rule's language, we must defer to it.

Reliant simply cannot point to any unambiguous language in the rule or elsewhere[15] supporting its interpretation that it is entitled to backbill Ellis for 26 months, without proof that Ellis did the tampering. Reliant first points to rule 25.480(e)(1)(B). This subsection refers to rule 25.125, which does not contain any express provision extending the time to backbill to over 180 days.

At the relevant time, rule 25.125 provided:

(a) If any meter is found to be not in compliance with the accuracy standards required by § 25.121(e)[16] of this title (relating to Meter

---

[14] The first corrected bill Reliant submitted to Pantoja was dated March 26, 2007; the PUC permitted Reliant to backbill Pantoja to September 27, 2006. *Pantoja*, slip op. at 5–6.

[15] We read the words of a rule in their context, also taking note of their place in the overall regulatory scheme. *See Celadon Trucking Servs., Inc. v. Titan Textile Co.*, 130 S.W.3d 301, 305 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (substitute op.) (citing *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

[16] At the relevant time, rule 25.121 provided:

(e) Accuracy requirements.

Requirements), readings for the prior six months, or from the time the meter was in service since last tested, but not exceeding six months, shall be corrected and adjusted bills shall be rendered.

(b) No refund is required from the electric utility except to the customer last served by the meter prior to the testing.

(c) If a meter is found not to register for any period, unless bypassed or tampered with, the electric utility shall estimate and charge for units used, but not metered, for a period not to exceed three months. The estimated charge shall be based on amounts used under similar conditions during the period preceding or subsequent to the period the meter was found not to register, or during corresponding periods in previous years.

16 TEX. ADMIN. CODE § 25.125 (2009) (Pub. Util. Comm'n, Adjustments Due to Meter Errors) *repealed* 35 Tex. Reg. 4669 (2010) (proposed January 1, 2010).

Reliant specifically points to subsection (c). Inclusion of the phrase "unless bypassed or tampered with" in rule 25.125(c) appears to express the PUC's intent that such three-month time limitation not apply in circumstances involving meter bypass or tampering. However, it does not address the 180-day limitation; it only allows rebilling for more than three months. This section also does not speak as to who must have tampered with the meter. Reliant argues that it does not have to be the customer under this subsection.

But another potential reading is that the requirement of subsection (e)(1)(A) of rule 25.480 that the customer be shown to be involved in the tampering also applies to backbilling pursuant to subsection (e)(1)(B). While rule 25.126 on

---

(1) No meter that violates the test calibration limits as set by the American National Standards Institute, Incorporated, shall be placed in service or left in service. Whenever on installation, periodic, or other tests, a meter is found to violate these limits, it shall be adjusted or replaced.

(2) Meters shall be adjusted as closely as practicable to the condition of zero error.

16 TEX. ADMIN. CODE § 25.121(e) (2009) (Pub. Util. Comm'n, Meter Requirements).

"Meter Tampering" does not expressly state that the electric utility's burden is to prove meter tampering "by the customer," the rule provides that a court finding of meter tampering, a criminal offense outside the PUC's jurisdiction, may be used to satisfy the utility's burden of proof, where such court finding would, of course, be limited to a specific person, or customer, not meter tampering as accomplished by some unknown party. *See* 16 TEX. ADMIN. CODE § 25.126(b); TEX. PENAL CODE ANN. § 28.03 ("A person commits [criminal mischief] if . . . .").

Also, reading further along in rule 25.480, subsection (e)(4) only allows the REP to charge interest to the customer on underbilled amounts where "such amounts are found to be the result of theft of service (meter tampering, bypass, or diversion) *by the customer*." *Id.* § 25.480(e)(4) (emphasis added).

Finally, although Reliant argues that CenterPoint's PUC-approved tariff for retail delivery service supports its interpretation of subsection (e)(1)(B) as not requiring a showing that the tampering be done by the customer, we believe it only further muddies the waters. The record includes an excerpt from CenterPoint's tariff in place at the time:

> 4.7.5 INVOICE ADJUSTMENT DUE TO METER INACCURACY
>
> If any Meter is determined to be outside of the accuracy standards established by the ANSI, unless bypassed or Tampered[17] with,

---

[17] Pursuant to rule 25.214's pro forma tariff, "tamper" or "tampering" means:

Any unauthorized alteration, manipulation, change, modification, or diversion of the Delivery System, including Meter and Metering Equipment, that could adversely affect the integrity of billing data or the Company's ability to collect the data needed for billing or settlement. Tampering includes, but is not limited to, harming or defacing Company facilities, physically or electronically disorienting the Meter, attaching objects to the Meter, inserting objects into the Meter, altering billing and settlement data or other electrical or mechanical means of altering Delivery Service.

16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (2009) (Pub. Util. Comm'n, Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities)

24

proper correction will be made of previous measurement data readings from the time the Meter was in service since last tested, but not exceeding 150 days from the current date except in the case of an overbilling. Meter Readings shall be corrected, adjusted, and corrected invoices rendered.

In situations where the limitation on backbilling or application of interest is not applicable as a result of the exception for Tampering or theft of service, Company[18] shall provide reasonable documentation, including photographs, if available, to the Competitive Retailer[19] upon request.

If a Meter is determined not to register for any period, unless bypassed or Tampered with, Company will invoice Retail Customer's[20] Competitive Retailer for the Delivery Charges[21] associated with the amount of Electric Power and Energy delivered, but not Metered, for a period not to exceed 150 days from the current date) [sic] based on amounts used under similar conditions during a period preceding or subsequent thereto, or during corresponding periods in previous years.

*See* 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (2009) (Pub. Util. Comm'n, Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities) (Chapter 4.7.5).

---

(Chapter 1: Definitions).

[18] Rule 25.214's pro forma tariff defines "company" as "[t]he transmission and distribution utility providing Delivery Service pursuant to this Tariff, and its respective officers, agents, employees, successors, and assigns." 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 1: Definitions).

[19] Pursuant to rule 25.214's pro forma tariff, a "Competitive Retailer" or "CR" includes a "Retail Electric Provider." 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 1: Definitions).

[20] Rule 25.214's pro forma tariff defines "retail customer" as "[a]n end-use customer who purchases Electric Power and Energy and ultimately consumes it." 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 1: Definitions).

[21] Rule 25.214's pro forma tariff defines "delivery charges" as "Commission authorized rates and charges for the use of Company's Delivery System. Delivery Charges comprise Delivery System Charges and Discretionary Charges." 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 1: Definitions).

Once again, although this chapter of CenterPoint's tariff includes language that indicates invoices may be corrected beyond 150 days in cases of meter bypass or tampering, it is silent as to who has to have done the tampering. And while this invoice adjustment chapter does not include the phrase "by the customer," or similar language, CenterPoint's tariff otherwise contains language tending to indicate that such tampering must be attributed to a specific person, or Retail Customer, or at least a person the Retail Customer has authorized access to the meter, before CenterPoint can assess any tampering-related charges within its "Rate Schedule." *See id.* (Chapters 5.4.6,[22] 5.4.7,[23] and 6.1.2.1.i[24]).

---

[22] Rule 25.214's pro forma tariff provides:

5.4.6 RETAIL CUSTOMER'S DUTY REGARDING COMPANY'S FACILITIES ON RETAIL CUSTOMER'S PREMISES

Consistent with Section 5.2, LIMITS ON LIABILITY (which limits any legal liability only as expressly stated therein), Retail Customer shall have a duty to exercise reasonable care not to damage Company Delivery System facilities on Retail Customer's Premises and shall not be considered to be a bailee or to have possession of those facilities.

*Retail Customer shall not Tamper with* Company's facilities or *the Meter on Retail Customer's Premises.* Company shall not be liable to Retail Customer for any injuries that result from such Tampering. Loss of, or damage to, Company Delivery System facilities on Retail Customer's Premises *caused by or arising out of Retail Customer's Tampering or failure to exercise reasonable* care not to damage such facilities shall be subject to the provisions of Section 5.2, LIMITS ON LIABILITY. Charges for such loss or damage shall be consistent with Section 6.1, RATE SCHEDULES.

The Retail Customer's authorization of the use of the Meter by a third party or designation of a Meter Owner does not relieve *the Retail Customer* of its obligations with regard to exercising care of the Delivery System or *of prohibitions against Tampering with the Meter.* Additionally, consistent with Section 6.1, RATE SCHEDULES, *the Company may assess charges to Retail Customer for any damage or loss caused by the Retail Customer or by parties to whom Retail Customer has authorized to access the Meter.*

. . . .

16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 5.4.6) (emphases added).

Faced with language that is "anything but clear and unambiguous," we must defer to the PUC's interpretation of its rule 25.480(e)(1) in its *Pantoja* order "so long as the construction is reasonable and does not contradict the plain language of the statute." *See R.R. Comm'n of Tex.*, 336 S.W.3d at 625, 628–29 ("When, as

---

[23] CenterPoint's tariff, as excerpted in the record, provides:

5.4.7 UNAUTHORIZED USE OF DELIVERY SYSTEM

In the event of use or attempted use of the Delivery System, without Company's authorization, *whether by Tampering with Meter or Metering Equipment* or by any other means, Delivery Service may be suspended by Company. Company must comply with all Applicable Legal Authorities and Section 5.3.7, SUSPENSION OF SERVICE. *A person found to be using the Delivery System without authorization* must pay the charge for restoring Delivery Service *as provided in Company's Rate Schedules* under which that person would normally receive Delivery Service and may be required to pay all charges, including the following, before Delivery Service will be restored or initiated:

(1) The Delivery Charges associated with the estimated amount of electricity delivered without Company authorization, which may be estimated based on amounts used under similar conditions during preceding years. Where no previous usage history exists at the same Premises, consumption may be estimated on the basis of usage levels of similar Retail Customers at similar Premises under similar conditions;

(2) The cost of replacement or repair of any damaged Meter and associated Company equipment;

(3) The cost of installment of protective facilities or of relocation of Meter, if necessary to prevent further unauthorized use; and

(4) All other costs associated with the investigation and correction of the unauthorized use.

*See* 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 5.4.7) (emphases added).

[24] Standard discretionary charge DCS.17, excerpted from chapter 6.1 "Rate Schedules" in CenterPoint's tariff, describes "tampering charges" to include "Delivery Charges, cost of replacement and repair of damaged Meter and associated equipment, cost of installation of protective facilities or relocation of the Meter, and all other costs associated with the investigation and correction of the unauthorized use." *See* 16 TEX. ADMIN. CODE § 25.214(d)(1) Fig. (Chapter 6.1.2.1.i) (same but not assigned a charge number). Such tampering charges are "[a]pplicable to unauthorized use of Delivery System pursuant to Section 5.4.7, UNAUTHORIZED USE OF DELIVERY SYSTEM or other *Tampering with Company metering facilities or any theft of electric service by any person on the Retail Customer's Premises*." *See id.* (emphasis added).

here, a statutory scheme is subject to multiple interpretations, we must uphold the enforcing agency's construction if it is reasonable and in harmony with the statute."). We thus conclude that the PUC's construction is entitled to our deference.

Therefore, we conclude that Ellis raised a fact issue as to his affirmative limitations defense sufficient to defeat summary judgment on Reliant's sworn account claim. *See Tello*, 218 S.W.3d at 114.

## C. Quantum meruit

Because the trial court did not specify on which claim it granted summary judgment to Reliant, we also must determine whether we can affirm the court's judgment based on Reliant's quantum meruit claim. *See Cates*, 927 S.W.2d at 626. Quantum meruit is an equitable remedy based upon an implied promise to pay for benefits received that does not arise out of a contract but is independent of it. *See AKIB Constr., Inc. v. Neff Rental, Inc.*, No. 14-07-00063-CV, 2008 WL 878935, at *4 (Tex. App.—Houston [14th Dist.] Apr. 3, 2008, no pet.) (mem. op.) (citing *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990); *Myrex Indus., Inc. v. Ortolon*, 126 S.W.3d 548, 550 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). In fact, a party generally may recover on quantum meruit only when no express contract covers the services at issue. *AKIB Constr.*, 2008 WL 878935, at *4 (citing *Vortt Exploration*, 787 S.W.2d at 944).

To obtain a summary judgment on its quantum meruit claim, Reliant was required to conclusively prove, as a matter of law, that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person

28

sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985). "The 'notice' element focuses on what the recipient of the services knew or should have known at the time the services were accepted." *Myrex Indus.*, 126 S.W.3d at 551.

In its motion for summary judgment, Reliant offered no distinct basis for the trial court to grant summary judgment on its quantum meruit claim, as opposed to its sworn account claim, arguing only that "the undisputed facts warrant judgment." Nor did Reliant list, much less address, the elements of quantum meruit in its motion. In particular, Reliant offered, and Mena's affidavit presented, no evidence in support of the fourth quantum meruit element—that is, to prove Ellis accepted Reliant's electrical services under such circumstances as reasonably notified Ellis that Reliant expected to be paid by him for 26 months of backbilled electrical service. *See Heldenfels Bros.*, 832 S.W.2d at 41 (affirming denial of quantum meruit recovery in bench trial where testimony did not reveal circumstances of reasonable notice); *Myrex Indus.*, 126 S.W.3d at 551–52 (reversing jury finding where "there is no evidence [estimator's] work on the disputed projects was accepted by [steel fabricator] under such circumstances giving reasonable notification to [steel fabricator] that [estimator] was expecting to be paid commissions"). Reliant thus has not met its burden to show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on its quantum meruit claim. *See Gray*, 343 S.W.3d at 529. Therefore, we conclude that the trial court erred in granting summary judgment in favor of Reliant on either its sworn account or its quantum meruit claim.

We sustain Ellis's third issue.

### III. CONCLUSION

Accordingly, we affirm the trial court's granting of no-evidence summary judgment against Ellis as to his DTPA claim,[25] reverse the trial court's granting of traditional summary judgment against Ellis as to Reliant's claims, and remand for further proceedings consistent with this opinion.


/s/    Tracy Christopher
        Justice


Panel consists of Justices Christopher, McCally, and Brown.

---

[25] Although Ellis generally complains that the trial court "wrongfully dismissed" his DTPA counterclaim within the prayer of his opening brief and requests reversal of the judgment as to both motions for summary judgment to ensure "due process" and "equal protection" within the conclusion of his reply brief, nowhere does he specifically challenge the trial court's granting Reliant's motion for no-evidence summary judgment, or provide any argument or authority in support. Therefore, he has waived this issue. *See La China v. Woodlands Operating Co., L.P.*, —S.W.3d—, No. 14-12-00066-CV, 2013 WL 4017373, at *4 (Tex. App.—Houston [14th Dist.] Aug. 8, 2013, no. pet. h.).